Exhibit "K"

Exhibit "K"

TIME: 1:39:13

BEGIN ITEM # 18: PUBLIC HEARING ON PROPOSED ORDINANCE NO. 288
AMENDING CHAPTER 5.16.060, ENTITLED FESTIVAL
ORDINANCE, PROVIDING FURTHER JUSTIFICATION FOR
FEES FOR THE LICENSING OF COMMERCIAL
ENTERTAINMENT EVENTS AND OUTDOOR FESTIVALS
AND ASSEMBLIES; PROVIDING FEES FOR SUCH
ENTERTAINMENT EVENTS; PROVIDING FOR THE
EFFECTIVE DATE OF THIS ORDINANCE; AND OTHER
MATTERS PROPERLY RELATING THERETO:

DARIN BLOYED:     We will go into item 18. It's 10:30 a.m. Item 18 is a public hearing on proposed ordinance number 288, an ordinance amending Chapter 5.16.060, entitled Festival Ordinance, providing further justification for fees with the licenses of commercial entertainment events and outdoor festivals and assemblies. Providing these fhor such entertainment events, provided for the effective date of this ordinance and other matters properly relating there to, this is a public hearing. We will allow public comment. Public comment will limited by minutes. Before we go on to this, I have a statement prepared that I worked with the District Attorney on. It's brought up several issues, to me, when this was actually first discussed and we started looking at different situations the county could be hit with. I guess I will start out first.

We have before us a proposed ordinance regarding amendments to the Pershing County Festival Ordinance. Prior to today's hearing I received, and I believe that Commissioners Shank and Irwin received, two memoranda from the ACLU and Black Rock City, LLC. The ACLU primarily addressed the nudity clause that is being proposed to the ordinance. Black Rock City, LLC addressed the nudity clause and the increase in fees in the proposed

ordinance. I believe that Black Rock City, LLC and the ACLU are incorrect in several assumptions.

First, the ordinance is not meant to trample upon anyone's free speech rights. In fact, I view the ordinance as an effort to preserve individual's rights of expression. With regard to the nudity clause, the primary issue that we seek to address is one of liability and safety. We are seeking to protect the innocent of society.

Second, the ordinance is not directed at any particular event. The ACLU and Black Rock City specifically suggest that the 1,000 person threshold and the application of the ordinance to only areas outside of the only incorporated city in the County of Lovelock. The basis for these two limitations on the ordinance is sound and I am absolutely confident we'll withstand a challenge.

With regard to the nudity clause, since the issue involves the safety of children, I met with legal counsel to discuss the matter. I have decided that I would propose, based upon this meeting, that we pursue other alternatives to address the safety of children at any outdoor festival to which the ordinance will apply. Ultimately, we have a duty to protect the defenseless members of our society, and we will endeavor to do so.

With regard to the monetary amount that is challenged by Black Rock City, LLC, the brief ignores several key facts. However, the original $1.00 figure per person, per day, for every day the event is held was based upon the variety of costs that were previously analyzed in arriving at that figure. The question is whether an increase is warranted. Gasoline prices in 2003 were $1.72 a gallon. Currently, gas prices are over $3.70 a gallon. During the time period, the costs of running government have increased as well. During this time period, the State has changed several items and placed more financial burden on all Counties, including this one. Whereas previously, several potential liabilities from the outdoor

festivals that are not planned for in our general finances, have been created. There is a need that liabilities be covered for these types of events in the event there is an occurrence that places the County at risk. Finally, I do not find that the amount proposed in the ordinance or even more per day for the event, per person, creates an improper increase.

Tickets to the event sell at $150.00 and up. We charge temporary occupants in the County with a 12% tax currently. With all that said, I would suggest that we have some discussion and motion on whether to keep nudity provisions, open it up for nudity provisions, that's right. At that point, I would open it up for discussion and public input. At this time, is there any public comment, public input?

TIME: 1:43:00

SERGEANT JERRY ALLEN:        On the public nudity issue? As a bill to the amendment of the ordinance?

DARIN BLOYED:    Yes.

SERGEANT JERRY ALLEN:        Well, **[UNINTELLIGIBLE 1:43:12]** and on the first page alone, it says **[UNINTELLIGIBLE 1:43:17]** this means that county doesn't allow nudity out there. On the second paragraph, where it says whereas the court has ordered. I'm making sure that is inappropriate around minor children, for individuals 17 years or any younger, for instance, it depends where nudity is allowed. I don't think that we've ever allowed it. I think the problem has been that we've had staffing and the logistics to handle it-Aside from being arrested for coming outside.

DARIN BLOYED:    Public comment? State your name, for the record. I'm sorry, you're Jerry Allen, Sergeant Allen?

TIME: 1:44:22

SERGEANT JERRY ALLEN:        Good morning, commissioners. I'm Jerry Allen. I'm from Burning Man Organization, along with several colleagues

and some others in the Burning Man community, and we have some concerns about the proposal, and I thank you for this opportunity to get this on the record. Most of the concerns stem around the issues of the prohibition of children and also the key structure, and we'd just like to speak on this a little bit, and I think, take it as a whole that we have a clear picture of what our concerns are.

TIME: 1:44:55

Regarding the prohibition of children, there's some legal challenges, some constitutional challenges, and I'm going to let some others speak on that. I know you've already received our memo as well. Also, I know you guys are concerned about the safety of children, and so are we. Once we found out about this proposed ordinance, we started to look through some of the records to see what issues have happened to children in the past. We haven't found any incidents. We looked through all the after-action reports from all the law enforcement agencies, and we looked in our own records as well. We have not found any issues of sexual molestation of children or anything like that, no children abductions.

TIME: 1:45:38

In fact, I have a statement from Professor Dwayne Hoover, who works with law enforcement closely. I submitted a copy to each of you. I'd like to reiterate that he's in Texas. He says, "I am the manager of Black Rock City LLC's Law Enforcement and Agency Liaison Team, and I have held that position for the last ten years. For the five years before that, I was the Ranger Director for the Black Rock Rangers, the Burning Man department dedicated to providing community welfare and the protection and security at the Burning Man event. In these positions, during each Burning Man event, I am the liaison between Black Rock City and all law

enforcement agencies that provide services relating to the Burning Man event, and work closely with these law enforcement agencies. I received constant reports from the Black Rock Rangers as to any security or law enforcement incidents that the Rangers deal with, in addition to various law enforcement agencies providing daily information and any law enforcement issues they observe and providing daily, detailed information, warnings, citations and arrests, and reasons for the warnings, citations and arrests. Therefore, I am aware of or have been made aware of every significant incident that has involved law enforcement issues in Black Rock City during this time. I have learned that the Pershing County Commissioners are considering an ordinance that would ban minors from attending the annual Burning Man event, and in part of the underlined reason that Commissioners are considering this ordinance is because of their fears concerning sexual predators of minors who might attend the event and molest children, and because children might be exposed to harmful material that would be obscene or would predominantly appeal a minor's prurient or morbid interest. I conclude that any such concerns of potential harm to minors of any sources are not supported by the historical law enforcement citations, arrests, or even complaints at the Burning Man events. I have reviewed the information that was provided to Black Rock City, LLC, and to me personally, by law enforcement personnel concerning complaints and citations or law enforcement concerns. During the last fifteen years at the annual Burning Man events, while I have been an active law enforcement and security issues affecting the events, I have conferred with other managers and Black Rock Rangers and other law enforcement personnel, and my review leads me to conclude as follows: There have been no complaints or arrests for child sexual molestation, and no complaints or arrests that a minor has seen material that

would be considered obscene or that would predominantly appeal to a minor's prurient or morbid interests." Thank you for letting me read that statement.

TIME: 1:48:03

As Dwayne mentions, there doesn't seem to really be any safety concerns regarding children. We wanted to find out from the commissioners what concerns you had, and if there was other ways that we could work together to mediate those issues. In regarding the fee structure, again, there are some legal issues that some of the others are going to bring up, and the only comments I have were we have a contract with the County that we signed almost eight years ago now, that enabled us to avoid litigation of this issue and save money and save time. It's worked very well for the last eight years. We've donated almost $330,000 for the County under that contract, and that's not including the amount that we're set to donate this year. The term is for as long as Burning Man's in the County, so we're not sure why the commissioners want to go forward with the amendment. In fact, it seems that the settlement agreement we have holds here, so we're not sure how this ordinance would even apply to us in the first place. We'd like to ask that you examine these other issues, work with us on any concerns you have about child safety, and vote against this ordinance today and work with us to mitigate and transcend any concerns that you may have. Thank you.

TIME: 1:49:23

REBECCA GASCA:   Good morning, my name is Rebecca Gasca. I'm Legislative and Policy Director for the American Civil Liberties Union of Nevada. I want to thank you for the opportunity of speaking in front of you today, and I want to apologize, first and foremost, for not being able to have participated in the drafting of this ordinance or speaking with you during its drafting stages, nor during its first

readings. I track approximately 140 public bodies for the commissions across the state, so you can imagine that I stay pretty busy. I'm really happy to be here today to talk with you about this issue. It is one of constitutional import, and you all, I think, had the opportunity to read the letter that the ACLU has drafted by Allen Lichtenstein, General Counsel with respect to the constitutional issues. In fact, I'm not going to elaborate much on several portions of the memo. I think it speaks for itself. I do, today, though, want to concentrate on a sentence portion of the memo, which begins on page three, of the document.

I'll concentrate my remarks to three areas, and that is the pneumatic constitution requirements, the Nevada statutes and the laws, at least for statements of nudity and obscenity, especially in respect to minors, and then also talk about your proposed changes. I want to make it clear that the pneumatic constitution, the part in Article 4, Section 25, it requires the establishment of a uniform system of government across the state. One of the Nevada supporting cases, Lamb v. Mirin, states specific County ordinances are subordinate to statutes, if the two issues conflict. What's important here to understand is that **[UNINTELLIGIBLE 1:51:10]** with nudity, obscenity, and I'll go into that a little bit. But that's the overarching issue here, that the pneumatic Supreme Court specifically said that Nevada law can trump whatever ordinance that a County might bring forward. Please do keep that in mind.

TIME: 1:51:30

From our perspective, there are numerous portions of the ordinance changes that do conflict directly with the state law. That is under NRS 201.235, on page 3 of my memo here. I'm not going to go into it, but basically it follows obscenity standards as created by the United States Supreme Court in the Miller Decision. It

7

delineates between what is to be considered obscene and what is to be considered First Amendment expression. Let's be clear, obscenity is not protected by the First Amendment. That's what the Miller Decision makes clear. It does say that, therefore, outside of those obscenity standards, what should be considered protected under the First Amendment.

TIME: 1:52:21

Nevada provides statutes despite those stipulations under the Miller Decision, and that's listed here. Anything that falls short of that Miller Standard and the NRS, the standard for obscenity is therefore protected by the First Amendment. Nudity, in general, whether it's for artistic expression, specifically set up for artistic expression or not, is actually protected by the Constitution. Your allowance or disallowance, I think, is not really an issue, as a previous commenter brought up, because it's clearly protected by the First Amendment. Now, with respect to the access of minors to what could be considered to some as maybe inappropriate is also directly addressed in the U.S. Supreme Court's supreme court decision, which deals with prescribing material that's harmful to minors. Following that decision, the Nevada Legislature also enacted a specific revised statute that reflects those issues, and that's on page four of the document. There are several components that must be met when dealing with minors, and that is predominantly appeals to the prurient interests of the minor, is patently offensive to the previous standards, and is without serious literary, artistic, political, or scientific value. The proposed changes of the Pershing Ordinance disregards that last part, with respect to artistic expression, because abstract as those proposed changes just kind of say, "That doesn't matter." However, the Nevada Law and Statute says that does matter. So, under the Miller and under Ginsberg and the revised statutes, it makes it clear that it is not just

simply nudity that would be obscene to children. The Miller Statute then goes on to say what is appropriate for minors to view, and it's very, very clear under NRS 201.560, oh!  Look at that! And that's unless a person or the minor is accompanied by their guardian or their parent or spouse, that mere presence of nudity is not to be considered obscene and then therefore, that expression is protected under the First Amendment. That is between pages four and five of our memo. So, from our perspective, we're here to urge you not to move forward with the proposed pages. You'll note in my memo that there are additional concerns that we have with the ordinance as it currently exists, and we really would like and welcome the opportunity to work with you so that we'll address the constitutional issues as they currently exist, and we really, really urge you not to move forward with the proposed changes, because again, we believe that it's clear under the Nevada Constitution and Statutes, as stipulated in the Miller statute and then as the current ordinances, it is in conflict with those. It makes it clear that there are constitutional concerns. I welcome any questions that you  might have, and I'm happy to address those concerns in person.

TIME: 1:55:42

DARIN BLOYED:          Any questions at this time?

CAROL SHANK:          Are you saying that the ordinance without the changes that are being proposed, that there's some areas of constitutional violation or whatever, in the current one we have?

REBECCA GASCA: There are some concerns, and that's addressed in writing in the memo that you already have, and that's in Section 1, Section 3. I completely would like the opportunity to work with you after this meeting, but for today, the proposed changes that, again, are really at issue, and my apologies for not having had the opportunity to

discuss this with you after the first and second meeting, but there are some clear concerns with how the draft ordinance is presented.

DONALD STRIPE:   You said there was no reports of child molestation. How many times have we heard that this child molestation goes on in years later, you hear about it? Whether there have been any not reported.

SERGEANT JERRY ALLEN:       If there were child ordinances, we'd know about them. What we are denouncing aren't our fears or rumors or conjecture.

DONALD STRIPE:   I'm just pointing it out, that very well all along, could not be reported. How many times does a rape go unreported because a person is embarrassed? How many times does a child be molested and is embarrassed and he never says a word until years later? You've got a case in the courts right now.

DARIN BLOYED:   Duly noted.

TIME: 1:57:50

TERRY GROSS:   Good morning. I'm Terry Gross. I'm Burning Man's outside General Council. I'm not an employee of Black Rock City, LLC. I think the first thing that I want to say to the commissioners is that the Burning Man organization shares your concerns. The Burning Man organization is very concerned and wants to make sure it has an event that protects children from harm and wants to have it as a family-friendly event. As I'll discuss a little bit later, the Burning Man organization voluntarily takes many actions to ensure its children are protected from harm. The fact is that the legislation, such as this ordinance that you're proposing, is simply not the appropriate method to protect children from harm, because as you've heard from the ACLU, there would be serious constitutional issues. I think one of the first things that I should point out is that the ordinance is addressed to the likelihood of nudity at the event. At the Burning Man event, partial nudity, it's not widespread. There's only a few people that are nude. They

express themselves by being partially nude there, and I will be frank with you that the Burning Man organizers and myself, I'd generally rather not see it, some of the displays. There's a reason why clothes are so important to us and why we spend so much money on them, but Burning Man is an event that's devoted to self-expression.

TIME: 1:59:46

The style of dress or undress some people view as part of their own self-expression, as Ms. Gasca told you about the First Amendment, that type of nudity is protected by the First Amendment, as being expressive behavior. What's really happened is the organizers don't really see any viable complaint, how they can rule that certain types of dress or undress are acceptable and others aren't. It's the same concern that the Supreme Court has addressed. There's a Supreme Court case - this is the only piece of law I'm going to talk to you about. Other things are going to be practical. There's a Supreme Court case that's almost directly the same thing. There was, in the city of Jacksonville, Florida, there was a drive-in movie theater where the screen was visible to the city streets. The city officials, the commissioners like you, they, like you, were saying, "This is offensive to children. It will harm children." They passed an ordinance that made it a punishable offense to exhibit any films that contain nudity. The definition of nudity is pretty much the same definition that's in your proposed ordinance, which was the human, male or female, bare buttocks, male or female bare breasts, human bare pubic hairs. Their justification for the ordinance was they were trying to protect minors from the harm of seeing those things. The Supreme Court, they acknowledged that this is a valid concern. The Supreme Court said that much that we encounter offends our aesthetic, if not our political and moral compass, but then they went on to talk about what the First Amendment provides in our society. They said,

11

nevertheless, the constitution does not permit the government to decide which types of speech that might be protected or sufficiently offensive to require protection from the unwilling viewer. The Supreme Court has made this bright line move that basically says the only type of speech that we can legislate against and protect people from seeing is arson. They went on to say that mere nudity wasn't enough. They talked about the types of nudity that clearly were acceptable speech, particularly in movies, babies' buttocks, scenes from cultures where nudity is indigenous, bathers on the beach. They said a newsreel of an art gallery would be okay.

TIME: 2:02:48

There's many instances, and what the Supreme Court has shown us is that it's impossible to threaten that kind of line, to say that this type of nudity is okay, but this type isn't. The only line in there that's wrong is upsetting. There's been no claim that there's any obscenity that's occurred. One of the things I think Mr. Shirley mentioned in the report is just the fact that though there are no reports of molestation doesn't mean that it occurs. The Supreme Court has addressed that as well. They've been analyzing these types of situations, and they've said that definitive proof of harm is necessary to be able to justify a type of restriction on protected speech. They said ambiguous proof won't suffice. Those fears, though we may have those fears and are concerned about them, that a legislature needs much more than that. If you look at the ordinance, which unfortunately, I have to read a lot of, but in those opinions, there was a case just last year that was sort of similar, where the California legislated against violence in video games. They wanted to prohibit the sale of any violent video games to minors. That's a very similar type of protection, and it's a lot of protection, but the Supreme Court said, even in that case, there were reports, there were studies done by research psychologists about how being exposed to violent video games made children

12

more aggressive. The Supreme Court even took these very detailed, published studies and analyzed them and compared them to other studies out there and just said, "Look, that's just not enough." It's not enough just to have some kind of basis. It's got to overcome all the other evidence that's out there. While I share Mr. Stripe's concern, part of my practice also deals with sexual abuse kinds of cases and stuff like that, and I agree, there's a lot that's not reported, but that's not enough by itself to justify an ordinance like this.

TIME: 2:05:28

DARIN BLOYED:   I'm limiting everybody to five minutes. I've allowed you a little more time.

TERRY GROSS:   Let me just, one of the ways that I think makes sense, I mentioned the Burning Man organization does things. Sub-regulation is we're an organization that do things that government can't, and that's what happens in movies, for example. We have a rating system about what minors can see and what they can't. That's not legislative. If a government has that rating system, it would be overturned as unconstitutional. But a private entity can do that, and that's what the motion picture industry did. They passed the rating system. Movie theaters which are private, they go along with that. The same thing in video games, there's a self-regulation stating to buy what video games. Well, Black Rock City self-regulates, and it self-regulates, for example, something that government can't do. As a supermarket owner, sometimes children get separated from their parents. When that happens, it happens many times, where you try and reunite them. At Black Rock City, even though there has never been a claim of child abduction, what Black Rock City organizers do is, as soon as there's a report like that, they close the gates to the city. They make sure nobody can get out of the city, in case there is an abduction. There never has been. The children are

always reunited with their parents within an hour or so. In addition, another way cities deal with that is through zoning. You've got the red light district, for example. When Black Rock City saw this was a problem here, that there could be issues like this in years to come, we dealt with it through zoning as well. There's a village that was created called Kid's Village, that's just for children. No one can camp there and stay there if they don't have a child, and it's where all these family-friendly and child-friendly activities. In addition, if there is anything that the organizers have seen that might be offensive to children, we go to them and say, "Put it behind closed doors. Make sure nobody can see this," and people know that they can't wander into something that could have any kind of offense.

DARIN BLOYED:   Sir, I've got other timed events on the agenda, so we're going to have to move on.

TERRY GROSS:    All that I'm saying is we are willing to work with you. Tell us what your concerns are, and we'll work to solve those.

DARIN BLOYED:   Thank you.

TIME: 2:08:10

ROSALIE BARNES: My name's Rosalie Barnes. I have a double-masters' in education and I work for Burning Man. I work in ways to think about how to better educate participants, how we can educate the world in a more important way about what it is we value and what we do at Burning Man, and I also work on issues related to knowledge transfer internally, and then organizations. As you may imagine, there are many departments in this organization. One of them, there's a number of them. We have to do extra work to make sure you understand all the work that's happening in different places. I, in the past couple of days, have reached out to some people who work in our medical facilities at Black Rock, and also people who run Kidsville, to get letters from them so they could, in their own

voices, tell you what they've seen, what they've observed, and their experiences with kids at the event. I have a packet. I gave it to you. I don't want to waste any of your time, but I just want to highlight that we have people who are trained to report child abuse who have gained a wealth of experience from being present at Burning Man events. The children do not face danger, based upon nudity. Nudity alone is not what we need to be concerned with. There's a doctor from New York who talks about having worked for nine times in the emergency services department in first response, and she's brought her goddaughter and grandchildren. She talks about that. I don't want to waste your time.

TIME: 2:09:55    Anyway, I just would like to ask you to please read it, because what the mayors from Kidsville do and the way they take care of their kids in their community is impressive. We would really- we share this common goal of wanting children in a safe event. There is true commitment, and if there's anything we can do, can we have collaborate conversations, can we think about it, can we work together, please, because we have wonderful teams working on this now internally. There are hundreds and hundreds of families who come to Burning Man, who care about coming to this event, so if we can work together in any way, we would be so grateful. Thank you.

DARIN BLOYED:    Any public comments? Yes, sir.

TIME:

SERGEANT JERRY ALLEN:    I have one, just in regards to what he said, about how can Burning Man regulate clothing. At any other event you purchase tickets to, whether it be a comedy show, a concert, movie theater tickets, they regulate clothing there. There's a way to do it. It's not just about not being able to regulate clothing. I just have another one for the board, and that's if there is going to be a separate discussion regarding the fee schedules.

DARIN BLOYED:       No, I don't think we can, we can take it separate. I'm going to go

                    back to fee schedules.

TIME: 2:11:42

JERRY SNEIDER:      Good morning. I don't want to close on your good graces, as far as

                    time goes. Let me introduce myself. My name is Jerry Sneider. I

                    am an attorney, practicing in Reno. I've been there about ten years.

                    I grew up on a ranch in Mesa Valley. I'm a fifth generation there.

                    I've been going to Burning Man for about eight years. I've taken

                    my daughter four of these years. This last year I took her, and I

                    took her a few previous years. I wanted to talk about my

                    experience, what that is like. There's certainly concerns. Any

                    parent would have some concerns taking their daughter to any

                    event like that, but they're not significantly greater than the

                    concerns I would have taking her to the Reno square, through

                    downtown Reno. There is safety concerns in terms of physical

                    safety, sunburns, things like that, but I don't think there is any

                    really great concern, in terms of nudity. I have never been in a

                    situation where she was in danger. If I was, if I have that sense at

                    all - and I'm not sure what your parenting situations are, but when

                    you are a parent, you have that instinctual feeling. You know when

                    your kid is danger. I've never been in a situation where that was a

                    concern. I've never seen a situation where I thought that there was

                    any danger related to my daughter, and I think she gets a lot of

                    great value out of the event. I'm on the board of Black Rock Solar,

                    and I've been bringing her into the Burning Man community. It's

                    been really valuable. She's participated in a lot of fundraisers. In

                    fact, the first fundraiser she did with Black Rock Solar fundraiser,

                    she was selling tickets and raised $1,500 to put a solar ray on the

                    elementary school, Black Rock Elementary School. She's learned

                    those sorts of things, she's ten now, so she's starting to learn to

                    swing hammers and build things. Bringing her out to that

community has really just been a tremendously valuable experience. I've been practicing law for about fourteen years now, and so I'm trained and conditioned to look for things that are a concern, both as a lawyer and as a parent. I do not put her in situations where there is something of concern. I really can very affirmatively say that the Burning Man event does not present any real danger, beyond those sorts of things that you are going to look out for in any situation, like if I'm walking in her in downtown Reno, there is going to be some things I'm uncomfortable with her seeing. There are certain situations that might not be something I want to take her into, but to say the event as a whole is inappropriate for children is, I think, not in a line of defense. For that reason, I really do urge the commission to vote against this and to really think about what specific concerns are and how to address those more narrowly, and in a way that does not prevent this community that's so valuable to myself and to many other parents. Thank you for your consideration.

TIME: 2:15:30

WILL PETERSON:   For the record. I'm Will Roger Peterson, and I'm one of the founding board members from Black Rock City, LLC. It's always an honor and a pleasure to sit before the commissioners, so it's good to be here. I'm going to summarize what we've heard so far. We had the event in Pershing County happily for eighteen years. In that time, we've had no evidence, no record of any child abduction or child molestation. That record stands strong. We have a city of citizens, of families that gather once a year on the Black Rock desert, which is a jewel in the county, and it's a family event. I feel very strongly about that, and I think that everyone who is involved with the Burning Man community feels strongly about that. In that time, we've donated hundreds of thousands of dollars to Pershing County, including a $300,000 solar ray, which continues to give

benefit to the areas, like the hospital and the school, and they will continue to get that added benefit to the future. Black Rock Solar is an affiliate company from Black Rock City, LLC. What's been a pleasure for me, over these years, has been our collaborative, cooperative relationship. We've always been able to work together on issues when they come up, and we've been able to solve them together. We have a mutually beneficial contract in place, and I believe that they address these issues through that contract; we can solve your rise of cost in doing business and some of the other social issues that have been brought up here today. I urge you to vote against the amendments that are being presented today, so that we can continue in the collaborative and cooperative movement. I would hate to go down a different route that's necessary in trying to solve these issues. Again, I urge you to vote against the amendments and continue our collaborative, cooperative relationship. Thank you.

TIME: 2:18:13

DARIN BLOYED:     No public input, no comments? Yes, sir? Yes, your honor?

JUDGE WAGNER:    Good morning. I've been listening with interest this morning. The concern I have goes beyond nudity and the ordinance.

DARIN BLOYED:     Your honor, we need your name today, for the record.

JUDGE WAGNER:    I'm Judge Richard Wagner. I'm holding the department together with another judge. Over three counties, we spend about two million dollars a year on juvenile matters, including issues that are before this board. I graduated from Hastings School of Law in San Francisco and what is happening here, they couldn't do this in San Francisco today, otherwise they would be doing it there. My concern goes much greater and it has to do with what I believe could be viewed as corruption of county government. These people come up here with millions of dollars, and that's what they do, is they're selling titillation to the public. That's the product they sell.

They're talking about how much money has been given to this county in terms of gifts and so forth. It appears that that could be hush money, to me. The bottom line is that I recall the days when joking forties, leading turkeys out to the county commissioners of the board and other things; and when I see free tickets floating around in the community and gifts of this kind, I doubt that the exploit of this board is that appropriate. This is much bigger, as far as I'm concerned than just the issue about nudity. This year, Sunset Magazine said the scene for Burning Man this year, "You walk in, you get naked, do drugs, play football, and set up a booth where you can smell other people's armpits, or least see the other people do that stuff at Burning Man. You see what happens when 50,000 people set up a city in a remote, barren, lifeless, cell phone service free, wind-storm bitten playa up in Nevada's Black Rock desert over Labor Day. You want to see what a lawless culture, built like 49ers and Deadheads and Cyber Punks leads to? National Magazine, I would say it in two words, "Penn State." People get up here and say we've never had any problems, well, I've presided over rape cases from Burning Man, and allegations of various other sexual things with adults. Then, we get an article in the Reno paper, September 5, 2011. The headline on that says, "For some parents, Burning Man is a great place to bring kids."

TIME: 2:21:53   I want to read that article, because it refutes so much of what is being said here. My concern is this article really demonstrates how little law enforcement is happening. The laws of the state and the laws of this county apply to Burning Man as much as they do to the city limits of Lovelock, and what's described in this article, if people were to do it here, they would be in jail, in prison. "Though it may be strange to see children at an event known for its love of personal freedoms, the parents who bring their children along say the experience is worth it for their little ones. I took a stroll through

Kids Camp on Saturday. It's a section of Black Rock City that invites families with children. There's a trampoline and residents of the camp say parents share the responsibilities to take care of the children. Iris is a 33-year-old from North Carolina, who declined to give her last name, said she was apprehensive at first about bringing her children, including an 8-month-old son. 'My husband, he had the idea,' she said. 'I wasn't sure about this place because of all you hear about it, mostly the more kinky stuff, which is completely different from the experience we've had.' She said that while there is a lot of nudity at Burning Man, it comes off very natural, and for the kids, it's just one big circus. They touch and climb stuff and lights. She added, 'It's been great for them to see what people can do creatively. It's positive.' It was the elements that had Vera Sharenoff, 40, a physician from Berkeley, California, concerned about bringing her two-year-old son. 'The biggest thing for me was safety,' she said. 'Sure enough, welt a covered wagon that has swamp cooler, a battery in it, and a chair for her son to sit in. It's also sealable in case of a dust storm. He and I can crawl in for shelter in place,' she said. She said the nudity isn't a concern, and if there is something she feels is inappropriate for her son to see, she'll go the other way. 'I didn't like the butt porn on the big-screen TV,' Shernoff said, referring to a display in the middle of Black Rock City. 'It was completely unavoidable, and I was like, he's a kid that's going to look at the TV. I've seen people having sex on the ply, but if you don't know what it is, it just looks like they're sitting on each other.' One day you're here, the next day a naked man strolled through Kids Camp, picking up pieces of trash. What would usually be an alarming situation in the so-called default world, 'Burners speak or what goes on outside the event.' The nude gentleman didn't did seem to cause a stir, according to Jason Langford, who brought his three- and five-year-old children.

'The kids never batted an eye,' he said. 'They told me I should offer him watermelon,' Langford said. He said they avoid the adult-themed camps, as a lot of dance clubs. The big deal is that this place is just debauchery and drugs everywhere, he said. 'There are naked people, but the children have made no comment this time around. They're just naked, so who cares? We also built a wagon for the children, so that when they were riding their bikes on the playa, there kids could go somewhere. We found that it's a big change in our kids, in terms of gross development,' Jason said. 'It really shocked their systems, so that they learned to deal with other things.' They said they were already planning on coming back next year for a third Burn, adding that their friends back home in Ontario, Canada, would likely come but what keeps them home is the expense of coming to Black Rock City. 'We could go to Europe and it would cost less,' Kemp said." That's the entire article. I find it very offensive that nobody thinks there's some issue with regard to this. This isn't just about nudity. It's more than that. It's far more than that. What these folks are trying to tell you about the law affects, and the law is comprised of - to a great degree - what the community standards are. I'm very concerned about what the community standards are becoming in this community. When they first came, everyone was shocked. Now, we've accepted them and now we're embracing them, because what? They bring money to the community? Something's wrong with that.

TIME: 2:26:33   Originally, I was opposed to saying that. They'll pay for the court system. They are not going to have their own court system. They shouldn't have their own law enforcement system. I have asked BCFS if they had any reports, one report, based upon any of this that has been reported. They didn't give one report of child abuse or neglect. That's not because nothing happened. I can't believe

21

the attorneys are not understanding the liability we have. They're the deep pocket, not the county. You folks have governmental immunity. They don't. The millions of dollars they have, they're putting that at risk, and the idea that they can self-regulate and have their own policemen and carry out their own regulations is ludicrous. It is people here, county officials, who have absolute duty to enforce the laws. You took an oath, as did law enforcement, to uphold the laws and constitutions of the state. That includes lewdness around children and the other things that have occurred. I'm not here, telling you how to do this as far as ordinance or provisions, but this isn't the place for young people under eighteen to be, under any circumstances. That's my opinion.

TIME: 2:27:53

DARIN BLOYED:     Thank you, your honor, duly noted. Any public input?

MACHADO:     For the record, my name is Richard Machado. I'm also the Sheriff of Pershing County. We've heard a lot of talk this morning about the safety of children. Black Rock's action plan actually has contingencies to shut that event down if there is a missing or abducted child. If they're not there, they don't need that plan. We've heard from Mr. Rogers. There's not been any cases of child abduction. What they know, as we know, the possibility exists. They know because they have contingencies if something like that happens. They said that, one of the ladies said that there was no reports of child abuse, and they have people trained to report child abuse. If they're not there, they don't need to have those classes. It's not my personal opinion, it's my professional opinion, that if the children aren't there, it makes my job in law enforcement easier, and those resources used to protect the children could be better utilized elsewhere.

DARIN BLOYED:     Thank you. Public comment?

TIME: 2:30:04

22

MAN 1:                Could I respond to someone?

DARIN BLOYED:    No, I'm not going to allow that. We can do that at a different time,
                        different venue. This isn't a trial or court. This is a commissioner
                        meeting, and that's just kind of the run of the mill, when you
                        decide to stand up here and appear and ask questions. Anybody
                        else, public input, public comment? Yeah, we can make it a two-
                        part motion. Would you guys prefer to go with each structure first?
                        Okay, we'll go to the second part of this, which is the fee structure.
                        I would open that up and read my comments, which include a fee
                        structure as well. I will open that up to public comment.

SERGEANT JERRY ALLEN:        Jerry Allen. I went to the clerk's office yesterday
                        and pulled up the last revision I could find for this, which was two
                        sets, which can be found in Chapter 516.5060, of the county code.
                        Within that, the county commissioners primarily, based on
                        population, it costs the county, on average, $3.18 per day per
                        resident to provide services. My question is, based on that, why are
                        we only going to increase the fee to $1.50? If it costs $3.18 to
                        provide services, for our county to lose money, why don't we go
                        above that, especially since it's a county policy, they don't have to
                        have the input. **[UNINTELLIGIBLE 2:31:39]**

TIME: 2:31:39

DARIN BLOYED:    Okay, any public input?

TERRY GROSS:     Any fee structure that regulates expressive events must certainly
                        almost be narrowly drawn for achievement in basic Supreme Court
                        jurisprudence. Anything that restricts content, the fee structure
                        assets, they don't apply to this ordinance. The restrictions, it just
                        doesn't, it can't meet that standard. It actually can't even meet a
                        rational basis standard, and there is another standard as well, which
                        is that fee structures have to bear a relationship to any of the
                        county's expenses. The Deputy Sheriff has referred to the fact that
                        the cost is progressive, but how many services are provided to

residents throughout the year. In terms of the services that are being provided for the eight days that the Burning Man takes place, there are minimal services that are being provided. It's certainly not ones that this fee structure, it could be heavily embellished. That would be closed off to the Burning Man organization. There just is no rational basis that would show that there's that cost here. In addition to the fact that we have certain restrictions in the ordinance, which is only for events over a thousand people and doesn't apply to events of any size in Lovelock, also make sure that this ordinance doesn't pass the rational basis, because those exceptions aren't rational, when you're trying to look at the ordinances. Those are the only ordinances that should apply to any event over that's happening for those services. That's all.

TIME: 2:34:21

DARIN BLOYED:     Thank you. Public comment?

REBECCA GASCA:  Rebecca Gasca again, Policy Director for the ACLU. I just wanted to come up. I was going to speak on it, but I just wanted to point out that some of these issues, with respect to the licensing scheme are addressed in our memo in the first section, and the fact that we believe that the ordinances are subject to strict constitutional scrutiny, for some relationships to the rational basis test, which would be assuring that from a legal term and how an ordinance or piece of policy should be judged by the courts or should appear in front of that, and we do share some similar things.

TIME: 2:35:12

DARIN BLOYED:     Thank you. Public comment?

RAY ALLEN:            I'm Ray Allen. I've been working with the County for eight years related to Burning Man issues, and today was the first time I had ever heard of the number $3.18. I'd like to work with you guys some time to find out where that number came from. It's my understanding-

24

SERGEANT JERRY ALLEN:        That's actually findings from the previous analysis.

RAY ALLEN:        Okay. I'd like to see the documents at some point.

SERGEANT JERRY ALLEN:        Those records don't exist.

RAY ALLEN:        They don't exist?

SERGEANT JERRY ALLEN:        No, they don't. The county commissioner made that comment.

TIME: 2:36:00

RAY ALLEN:        My point is, we made a commitment to the county to bear the costs of the event on the county, and I think we've worked with you guys over the years to come up with what those costs are, law enforcement costs, I know there's a constant court system, prosecution, also marriage licenses and things like that. It's been my understanding that we have compensated the county for all of the costs, the impact of the event, and then we've also given charitable things on top of that, just to build the community. If there are any other costs that aren't being compensated, we would like to see that. I think, before you vote on this new fee structure, it would be nice if you could share those costs with us, just so we know what it is that the county feels it hasn't been compensated for over the years.

TIME: 2:36:50

WILL PETERSON:        I'm director Will Roger Peterson, of Black Rock City, LLC. I take over this previously. We have a contact in place, and that contract will supersede anything with this new ordinance. We have a contract in place that will apply- the new amendment will apply to everything else, but for who you're contracted to. In our contract together, it states that that contract is good for as long as the event's held in Pershing County. I just want to make sure we're clear on the nature of our contract. It's a good contract, and I'm also willing to negotiate. If your cost of doing business has

increased, let's sit down and collaborate and cooperate to create a mutually beneficial solution for the issues. Thank you.

DARIN BLOYED:   Thank you. Public comment? Public comment from BLM?

ROLANDO MENDEZ:   Good morning, commissioners. For the record, I'm Rolando Mendes, BLM Field Manager for Black Rock Field Office. It's good to see you all today. What I can share with you is what my observations have been with working with Black Rock City, LLC. My walkaway point is the full confidence in their commitment to make things right on public lands and in the relationships with communities. I see their actions aligned with their intent, so I will not address the ordinance in particular. What I'm trying to get at is my confidence in the character of LLC, in this case, Black Rock City. If there's specific questions of me, I can certainly address them.

TIME: 2:39:05

DARIN BLOYED:   Any public input, public comment? I'll put yours on the record. Thank you. Any other public comment? Discussion? I'd like to hear public comment, if we have any, from the commissioners. Mrs. Shank, any comment, any concerns, any questions?

CAROL SHANK:   I have not been out to Burning Man, so I am at a disadvantage, in that I have not seen what actually happens there. The Kidsville or the kid's portion, how many families are in that area? Just approximately.

REBECCA GASCA:   Three hundred families, and it's one of the largest villages.

MAN 2:   Can I add to that question? If so, you've got kids that are in a family environment. You made an earlier statement that you have to be a family member to stay in that area. If I want to come to Burning Man, and I have a family, but I want to stay with my other friends, do I sit out in the other area? I can go anywhere I want, so that's not the only families that are out there, but I would not be

welcome in there if I wanted to bring my friends to come camp with me, too, because they don't have families.

REBECCA GASCA: Correct.

CAROL SHANK: Is there a separate area for children for the organizers of the event?

REBECCA GASCA: Many of the organizers do bring their children.

RAY ALLEN: We have two villages at the moment, places where there's children. It's the model place, it's been there the longest. They teach other people how to mind their children and things like that, but there are certainly other family camps, **[UNINTELLIGIBLE 2:41:03**]. The facility is like a playground, and so there are a lot of other families with children who might be camping someplace else. They go there because there's tents, there's face painting, there's many things there for kids. It's open to everybody that has kids.

CAROL SHANK: Other people can go in there as well, like the article from the Reno Gazette Journal supposedly had a nude person walking through. Other people could walk through.

REBECCA GASCA: You may walk through there. There are not walls. There are flags and every child **[UNINTELLIGIBLE 2:41:50**].

TIME: 2:41:50

TIM: The people in the village, they're watching what's happening. Like all parents with children, the children will play and you watch them. You keep an eye on them. The same thing happens in Kidsville, even more so.

CAROL SHANK: Does Burning Man charge for children? Is there a age limit where you don't charge for children? Does everyone have a ticket? Under two? Any child over two or thereabouts is charged a ticket?

TIM: No children, no one under eighteen is allowed into the event without a parent or guardian or responsible adult. It's written on our tickets, it's enforced, it's checked.

CAROL SHANK: Thank you.

DARIN BLOYED:      Go ahead. Would you explain that again? I didn't quite understand that. Does every child buy a ticket?

TIM:      Yes, after about two years old, close to two years old.

DARIN BLOYED:      Are those discounted by any way?

TIM:      No.

DARIN BLOYED:      No? Okay, thank you.

CAROL SHANK:      How are they enforced?

TIM:      When we open the gate, everyone has to go through the gate. We have a setup with some 300 people that run the gate, and we actually check - one of the things we do check for, like sneaking into RVs and places like that, so we search every vehicle for every person.

CAROL HULTGREN:      How do you enforce the age limit? If four people come in, how do you identify them?

TIM:       We don't let them in.

CAROL HULTGREN:      How do you know they're underage?

TIM:      We check their I.D.s, their names and ages.

CAROL HULTGREN:      Like a driver's license, or picture I.D.? Are people allowed to come and go, once they buy a ticket? Are they allowed to come and go?:

TIM:      No, not really. We charge people twenty dollars to be able.

CAROL HULTGREN:      To be able to come and go?

TIM:      The age where we're checking the  [**UNINTELLIGIBLE 2:44:30**].

TIME: 2:44:30

PAT IRWIN:      Question about the contract. I noted in there, the statement that you made that this contract supersedes and goes beyond the existence, as long as it's happening in Pershing County, that contract is in place. Just in my dealings with state contract and county contracts, I was very concerned with that, because I've never seen a contract that could lock in the next bunch of county commissioners as they

28

come on board. I have concerns with that element, and in dealing with some of the other portions of that contract, there was some stipulations in which that contract became null and void because of the police or the law enforcement that BLM was taking care of in the original contract, was then changed, and so that amended that first contract. I'm kind of a contract point, because with some of the statements that were made, I'd like to hear them addressed.

TIME: 2:45:35

JIM SHIRLEY:      The 305 contract had a revision that said that the agreement was conditioned upon BLM, that they covered law enforcement costs. In 2006, BLM chose to go a different route and require Burning Man to start paying for those costs. We agreed to support BLM in their appeal at that time, as we required no prior agreement, which we did. By '07, that appeal had been denied. We agreed to a three-year contract. In 2010, we agreed to a one-year contract, and in 2011, we agreed to solely a one-year contract. The 2011 contract preamble says that this agreement is subject for renewal by both parties in writing.

TIME: 2:46:27

TIM:      I believe, Mr. Shirley, you're referring to the law enforcement agreement. This is another contract. Every year, there is one per year. There is an agreement that specifically deals with law enforcement costs, and that Black Rock City, LLC reimburses the county for any law enforcement costs under any condition.

JIM SHIRLEY:      But that was in 2005.

TIM:      The 2005 agreement was premised upon-

JIM SHIRLEY:      Premised, now all we have is the law enforcement agreement.

TIM:      There was an agreement in 2005 that said the ordinance [UNINTELLIGIBLE 2:47:10] Black Rock and Burning Man BLM.

TIME: 2:47:10

29

DARIN BLOYED:     We'll bring that back up. I don't remember it that way. I want to see a commissioner's, although I will get to it, on some of the failures of the commission, in earlier years, I'll get into it after the questions are asked here, but it gives Mr. Shirley our legal counsel a chance to go and look at that initial agreement. I don't see commissioners, again, in the failures of what happened in the past, write a policy or an agreement that would last for years and years and years. I will allow your questions, and then close this thing up, we hope.

<mark>TIME: 2:48:00</mark>

CAROL SHANK:     Because I had the same question on that. Because you're saying that the 2011 agreement isn't a new agreement, it's just before on the law enforcement portion.

TIM:     The 2011 agreement was a separate agreement…

CAROL SHANK:     Yes, and I have the 2005.

<mark>TIME: 2:48:20</mark>

DARIN BLOYED:     Our contention is that it's superseded by the new agreements, which is in its entirety, and now we go to just a law enforcement agreement. We don't have this agreement in place anymore, after 2007.    That's our contention, because at that time, 2007, BLM pulled out of reimbursing Pershing County for law enforcement costs. Therefore, we sat back down and renegotiated just a law enforcement contract, not this one. That's the way I look at it. Again, I don't see commissioners doing something that would tie hands for thirty, forty years down the road, especially knowing that you guys are going to grow. At that time, we supported your growth and we didn't know what all our costs were. We did some of that stuff just to do our cost analysis. What are our two costs? We have agencies that are working with us to tell us what those true costs are. Our contention's always been that it can't cost this county one penny. It shouldn't cost taxpayers, in this county, one

dime. That's been our contention. That's why I'd like Mr. Shirley
to give him a chance to look at that, so it does answer all your
questions before we do go on.:

TIME: 2:49:30

JIM SHIRLEY:        That's a major concern to him. The second question that I have is,
based on your statement that you made, and just to clarify, because
we are a three-person order. We don't talk about these outside of
here, so this is my only chance. Although we do talk with the DA
and talk with others, so there is some over that, your statement as I
read that, or as I was listening to that, it's your intent, then, to
modify this document, the ordinance that's enforced now.

TIME: 2:50:11

DARIN BLOYED:      It gives you options. I think it gives you options. I want to be
careful, because I do have a closing statement and I want to make
sure that that's factual and clear. It gives you the opportunity. Do I
feel the constitutionality of the minors is an issue? Yes, I do, but
hearing the other side of it, I think there's ways, and I feel
comfortable that we can fight that and win that. I am very appalled
by the articles as well. I don't think a lot of this is sitting in front of
us yet, but I'm sure if it got to us, that this stuff wasn't waving
around in Pershing County state all over the world. It's very, very
upsetting. Immoral, I'm not here to legislate morality and I'm
going to tell you that right now, I'm not going to do it. I will do
what's right for Pershing County residents and protect the
liabilities to every resident in this county. I believe that the
children out there could be a huge, immoral or not, liability to the
county at some point. It hasn't happened yet. We haven't heard
anything yet, that's true, but it could. I think it's every parent's
right to do what they want, in a sense, but I also think that a lot of
the parents out there are walking a fine line. If you've got someone
out there half on the ball as far as law enforcement, they can arrest

31

those people for subjecting those kids to the middle of the desert pornography porno. That could happen, but that's me. I'm not a lawyer and I'm not an officer. My biggest fear is a kid coming up missing at Burning Man. You can check everybody coming in, you check nobody going out. They could have a kid in there, the parent wanders off, has a few beers, whatever, and their kid's walking aimlessly on the . Don't tell me it can't happen. It happens everywhere, and that kid comes up missing a couple hours before she notices. That kid's back in Frisco or somewhere else, who knows? I don't know, laying inside a river. Again, it comes back to liabilities to the county. You talk about the fee structure, the $1.50, I think it should be higher than that, but you can have an innocent person get hurt out there. Those liabilities can fall on this county. If somebody gets maimed out there, we can be in a half-million, million dollar lawsuit. You got deep pockets, they're going to sue you as well. Indigent care, if they wanted to push it, and you can ask Mr. Irwin this, can come back and haunt this county, is that correct? Those are all legitimate concerns, and that's why I believe in the memo that I wrote that supports this. I am going to go a little further, and I'm going to say it right out in front of everybody, that I don't tolerate threats, whether it comes from a district court judge or whether it comes from Burning Man. The agreement with Burning Man was that they would allow tickets to come out, because we tried to get as many people to Burning Man from the county that couldn't afford it, out there. If I did something wrong, I'm going to take a slap on the hand and I'm going to go the other way. There was no intent there. I did not profit from it whatsoever, so that's not going to play in my decision today. Neither is the thought of getting sued, and having Pershing County fight a lawsuit they can't afford. I don't believe Burning Man wants that on their resume, that they broke Pershing County, because you're

going to have more than Pershing County fight me. I guarantee you
that. I think I've my said my piece. I don't want to delay a little
longer. Mr. Shirley?

TIME: 2:53:15

JIM SHIRLEY:      I'm reading from the '05 agreement, on page 3: This agreement is
subject to continued payment of law enforcement costs by BLM.
The original agreement was premised in subject to that, and when
they quit paying it, we fulfilled our part of the agreement. We tried
to negotiate and continue to rectify that decision. '06, we agreed to
have a one-year payment structure while you pursued your appeal.
In '07, we agreed to a three-year structure. In 2010 and 2011, we
agreed to one-year structures. After '05? I don't have one after '05.

TIM:      I think, based on what you said, though, I want to see. What you're
looking at is a modification of this.

TIME: 2:54:30

DARIN BLOYED:      I'm not going to tell you that I want it modified one way or the
other. I think that's per the evidence. You heard the evidence out
there as well. I do want to get back to one comment I made in the
past, with the other commissioners. We had the opportunity, at one
time, and failed miserably, to stand our ground on the ordinance,
the way the ordinance was written. I, for one, being a very new
commissioner at the time, let potentially threatened that we're
going to put this community in a huge lawsuit that we can't afford.
Knowing what I know now and having a little more experience, I
would have stood my ground, so I apologize to the citizens for that.
I think this thing would have been an ongoing thing, I would have
done the right thing to start with. I don't think that was done, but I
will say we created a relationship with Burning Man. I agree with
some of what the BLM officer's saying, that they do what they say
they're going to do, but I don't think, at any longer, can we stand
by and make it look like that we're being mobbed by organizers of

33

the Burning Man. One, that's my field. Two, it's the liabilities I can't go along with kids out there. I believe there should be a fund for indigent people out that get hurt. That could break this county. Would you like to state what you said about Remsa earlier?

TIME: 2:55:48

PAT IRWIN:   Well, the comments that I had made there during the first portion of this meeting was that, in Remsa's negotiations and in talking with Burning Man, they had asked for more money from Burning Man, and I think it was somewhere around $300,000. They had made some information shown to me as to what they paid for, court bodies or some of the breakdown is actually on the internet, the full disclosure of what their costs are. In the negotiation, that caused them to look at what other options are out there, and actually a decision was made to go with Humboldt County at that time, not only for the costs, but for the better service or the options that they have with bringing somebody in new, that would be looking at things in a different way and actually increase the level of service, safety and protection. With that, looking at the numbers that were presented from Remsa, they had said that they had taken about $625,000, written it off in repair flight or through transport or through non-funded medical bills for not knowing who they were or in an indigent kind of situation. That directly could have been put back to us on our indigent fund account, and so with that being the case, it was never pushed forward, but it's a liability that is a fear to us, that we could be responsible for any of those people in an indigent case. With the state stripping the indigent fund, it really became an issue this year, because now we don't have the indigent fund capabilities for that money that was collected specifically for indigent care. It's been put back into general funds for the state of Nevada. It really puts us into a critical state, just this year, because of the budget changes. In my question to Darin,

because based on what I have read through all of these statements, the dealings with the District Attorney, looking at what's noted here as far as the child side of this, as far as if we remove that, it would leave basically everything that's on page five as the change. If that's not correct?

TIME: 2:58:06

DARIN BLOYED:    It can be. The question is, we've got a couple options here. The answer is in a couple offers here. One, we've heard a lot of evidence from all kinds of different professionals and so on. You've heard from me, you've heard my feelings on it. I know you guys have your own feelings on it. We can continue the meeting until December 21st, we can pull out the provision of the nudity, which would include the kids, or we could pull out the ordinance of the fee increase ordinance, or we can go ahead with one of the others. It's open to you. I'm taking motions, if you guys are comfortable at this time.

TIME: 2:58:43

CAROL SHANK       Burning Man's position is that it does not apply to it, because of the prior agreement. That has to be determined yet, because we're not really clear on that, but this ordinance applies to every event in the county that's 1,000 people or more. Personally, I think that the fee from a dollar to $1.50, I think we should have it at least at $2.00 per person per day. A $1.50 isn't even coming close to covering the cost. As far as, let's say we had another event in the county that wasn't on BLM federal land. Would we be allowing nudity there? We wouldn't, because we would be in the law restraints of the county, I'm thinking, what the sheriff has to enforce. Because this is a separate event on federal land and, in a sense, it's an isolated artistic event, which I understand that, there are things being allowed there that wouldn't be allowed anywhere else in the county.

TIME: 2:59:58

PAT IRWIN:    I think that that's the true issue is, based on the laws that are on corpus today, I don't think it matters whether it's on BLM property, personal property, or county property. We need to treat that all the same, across the board. I think there's been a lot of offers on the table today, to do some workshops, to talk, to engage, and to come up with what can be best to modify this. I have some open questions, and something that I don't have in front of me that I can study is an amendment that has been brought up. I don't know if that's been found by you or if you have anything like that. I truly feel that we need to push this a little further. I'm in total agreement with Darin in the sense that, coming from the private sector, if I'm charging a room tax for somebody to stay in Pershing County at the hotel, 12% per night, per ticket, per whatever, that is getting more and more common. When we look at the fiscal tax or, I'm trying to think of the tax that the actual place, the luxury tax, lodging fees. When I went to the Peppermill and stayed there, there's more fees that are not going to the counties or the cities. Those are going to the hotels to maintain their costs, in having hotels in that environment. Lots of questions here. I'd like to see us move to a workshop-type of environment and get more feedback and get more answers on the contract. Again, what Carol's saying is that this is not just a Burning Man issue. This is a full-county issue, so I'm looking at it as a package. We still need to determine whether this has anything to do with that particular event, once we do this pass this and in what fashion we pass it in.

TIME: 2:01:43

DARIN BLOYED:    I disagree with that. I think if we do some more, because again, I'm concerned about the constitutional issue, what's biggest for me is the kid side, but I feel adamant that they should not be allowed. Some homework, working with the ACLU on this and with

36

Burning Man, could be done, but I caution that we need to do it quickly, because we work in conjunction with BLM's contract. BLM's contract is for one year, I understand, because they had a violation or whatever, and they're looking at a five-year contract. We'd like to make our contracts, if we have any contracts, that might supersede anything, anywhere. If we don't have a contract, we just go with the ordinance, but if we do go the other way, we need to have that in place before the five-year contract, and before the one-year contracts. In their contracts, it stipulates that they will abide by county and city ordinances.

PAT IRWIN:    Rolando, approximately when do you feel that you're going to have that contract in place and ready to move forward with a five-year?

TIME: 3:02:41

ROLANDO MENDEZ:    I expect to reach a decision on the five-year analysis early of next year.

DARIN BLOYED:    You might not be a hundred percent, but you need to move faster. Do the right thing. In the state of my position, it's hard sleeping at night, knowing that liability exists and I believe it's a real one. I know you can't live in fear, but I wanted to do the job and I'm going to do it. Mr. Skeen?

DRU SKEEN:    I'm Dru Skeen, Chairman of Tourism Authority. They do donate $50,000. I know it's not a tax, but we passed through that last year, just for the record, so where it goes around the county court. They don't pay a tax, but they do pay in what we don't charge them.

DARIN BLOYED:    They donate many, organizations do many good for that, yes. Thank you.

TIME: 3:03:50

CAROL SHANK:    NRS 244 allows counties to set a fee, and I think as long as we set a fee that's reasonable, and I'm referring to the ordinance, that there shouldn't be any problem with that. The legality issues of the

First Amendment rights and all that, I'm not a lawyer. I don't know those things, but I am concerned that we have laws within the county, because this ordinance applies to anything within the county. If we were to have a bicycling event, and there were 1,000 people, and I hope someday that we do have other events that are more than 1,000 people in this county. That's our goal, to build up our economy base that way, that we  looking at enforcing all laws that are necessary. Whether we need it written here or if we just use the existing laws, I don't know. My other concern is I don't understand how commissioners, in 2005, commit the successing commissioners to an agreement.

DARIN BLOYED:    You don't need to read it to us. There was always- even on their behalf. I'm not going to focus on that right now.

CAROL SHANK:    That's why I'm concerned about that, because I would never, ever agree to anything like that.

DARIN BLOYED:    I can either entertain a motion to adopt the ordinance as written. If either of you would like something stricken from the ordinance, I can pass it that way. If either of you would like to continue the meeting until December 21st - it can't go any longer than that, or we're going to re-advertise that, right? If you guys are on board, we can get something done before December 1st. We might put it in, just for safety's sake.:

TIME: 3:05:38

TERRY GROSS:    May I make a suggestion? I think one of the things that's owed the Burning Man Organization is basically, I think, what we've been discussing, which is meeting and confirming [UNINTELLIGIBLE 3:06:05] the Commissioners be concerned about, and rightly so, is what are the costs? Black Rock City, LLC, I think, has made a commitment to cover those costs, that there shouldn't be anything. If those have increased in ways that haven't been addressed in existing agreements, we should discuss those

38

|  | and try to work them out. I'm a little concerned that December 21st especially doesn't really give us enough time to work through, so I would suggest putting it over to either your meeting in January or perhaps a little longer, to give us enough time. I think that we have a very good chance of being able to resolve some of these things, without entering into something that this ordinance has referred to. |
|---|---|
| DARIN BLOYED: | Let me go back to the one-year contract, more importantly, when does that let, for 2012? When does the 2012 contract between Burning Man and BLM come out, or is it already out there? I'm going to do a one-year extension, is that right? |
| TERRY GROSS: | I expect an issue in early spring, regarding a five-year permit. That's an environmentalist thing. Following that, I'll make the decision on a one-year permit, so it won't be any sooner than early spring for next year's event. I'm making a series of decisions, first on the adequacy of the assessment, the environmental assessment, and then following that, I'll make a specific decision on those activities, Burning Man Event 2012. No sooner than March would I make a decision on the event for 2012. |
| PAT IRWIN: | When did sales start for it? |
| TERRY GROSS: | I think we're starting taking tickets in December. |
| DARIN BLOYED: | I need an answer sooner, rather than later. |
| RAY ALLEN: | Not necessarily. I mean, we can adjust these things with you, with the event or ticket sales. |
| TIME: 3:08:32 | |
| DARIN BLOYED: | Just to clarify, that decision in early spring can include a five-year contract at that point, moving forward, or you are definitely going to sign a one-year and then a five-year follow up? |
| TERRY GROSS: | At this point, I'm looking at a one-year authorization following for 2012. |
| DARIN BLOYED: | Rolando, one more question. Can you speak to the provision that you have in your permitting process, that Burning Man follows all |

county and local ordinances, as part of your licensing, part of your permit?

ROLANDO MENDEZ:   Yes, sir.

DARIN BLOYED:   Alright. That gives us a little more time to...Yes, your honor?

TIME: 3:09:22

JUDGE WAGNER:   All these lawyers ought to know that the Commissioner can't vote on a contract after your term of office.

DARIN BLOYED:   I didn't think so, either. Thank you. I don't think that will happen, but the provision's in there.

RAY ALLEN:   Can I just comment on that, too? Contracts aren't held by the organizations. Companies put in their ten-year contracts, when the CEO gets that, they don't get to just change that. The term of the contract is based on the term of the contract. It's not based on the following.

TIME: 3:10:00

DARIN BLOYED:   I like that. There's actually a special ruling in the state and the county government to avoid that, because of that four-year commitment to coming into office, about creating a liability for their county or their state, when they've gotten out of office. Yes, you're correct in the private sector, because I was signing ten-year to twenty-year contracts all the time, but here, I've mandated not to go beyond that kind of term.

RAY ALLEN:   I understand from your side of it. Just basic contract law, contracts are determined, the length is determined by the term of the contract. The term of the contract is as long as Burning Man is held in Pershing. Whether you folks are in agreement on that, I'm not sure.

DARIN BLOYED:   I'm not going to discuss that part any further. I'm entertaining a motion.

PAT IRWIN:   I would go ahead and give a motion, but we've postponed this to the meeting in the January. However, is that something that we can

do? I would like to have the time to work this out, and I know this meeting is coming up in December. I will not have that whole week as a training week for me, that I come back for this meeting. I will be leaving as soon as this meeting's over. Whether we can coordinate a workshop time to discuss...

TIME: 3:11:17

DARIN BLOYED:     Let's put it down for the 21st, and we'll decide at that time if we've done enough, and I'm okay with the 30th as a workshop, as a full workshop day, if that works for you two. Is that something you could do?

JIM SHIRLEY:     If this an important issue.

CAROL SHANK:     It's extremely important. Mr. Shirley, does that give you sufficient time, because we're going to have lots of questions to ask you?

DARIN BLOYED:     Can we make that a full day of workshops, starting at nine o'clock and going until five?

JIM SHIRLEY:     That's fine, if that's what needs to be happening.

DARIN BLOYED:     It would be the 30th of November.

CAROL SHANK:     Wednesday, November 30th, would that be a day?

RAY ALLEN:     That would work for me. We'll make it work.

PAT IRWIN:     That will allow us to have two more meetings in December. We'll agenize it back for a decision on the 1st of December, and if for some unforeseen circumstance, and we have to do something different, that still puts us under the advertising rules of this particular ordinance. We wouldn't have to extend it anymore. Darin, I think you had another question behind the poll. Everything we do is open to the public, so everybody in the public, it would be a posted meeting that anybody could attend.

DARIN BLOYED:     Do you confirm that motion?

CAROL SHANK:     I do.

DARIN BLOYED:     That's your motion?

PAT IRWIN:     That is my motion.

DARIN BLOYED:      I have a motion second, all in favor?

PAT IRWIN:          Aye.

DARIN BLOYED:      Motion's carried. We will move on. Thank you, folks.

END ITEM 18: PUBLIC HEARING ON PROPOSED ORDINANCE NO. 288
                    AMENDING CHAPTER 5.16.060…

BEGIN ITEM 19: BLACK ROCK CITY LLC/BURNING MAN UPDATE ON 2011
                    BURNING MAN EVENT

TIME: 3:13:30

DARIN BLOYED:      We will move on to item 19. Item 19 is Black Rock City, LLC and
                    Burning Man, update on the 2011 Burning Man event.
                    Commissioner Irwin, I believe you requested that they come and
                    give us an update?

PAT IRWIN:          Yes, I have talked to Ray about coming in to do the post-event
                    analysis and actually talking about all of the contributors that work
                    at Burning Man, giving us an update on their report.

CAROL SHANK:       Can we get that contract or agreement that we're missing?

PAT IRWIN:          I don't have it anywhere.

DARIN BLOYED:      Then we can review minutes and all that stuff as well.

TIME: 3:14:00

RAY ALLEN:         Thank you for this opportunity to report on this year's event. It
                    was, in our opinion, our most successful event yet. Commissioner
                    Irwin attended the cooperator's meeting that was held last month in
                    Reno. I'd like to invite everybody in legal counsel to attend those
                    meetings, as Commissioner Irwin has in the past. We're happy to
                    give a report. In fact, I forward to Ms. Wesner and Commissioner
                    Irwin copies of all the after-action reports from various agencies
                    that we've received so far. We're still waiting on a couple, and let
                    me just do some highlights and things that happened at this year's
                    event. We peaked at 53,963 participants on Saturday of the event.
                    Of course, that was just the peak. We rounded up to about 20,000
                    at the beginning of the week. Arrests were down, per capita. The

two biggest changes this year were the new Sheriff of Pershing County that we worked with, and also having Humboldt General Hospital take care of all the medical instead of Remsa for the first time. The collaboration with both of those agencies was phenomenal. In fact, we worked best with most of those agencies than we've ever had in the past. We're very pleased with the work that Sheriff Machado did this year, and going off of Sheriff Machado's report, there were five arrests for the county and nine citations. As far as Humboldt General Hospital goes, it brought some new services that we weren't able to have in the past. We had a new medical tent. Humboldt General Hospital also brought an MRI machine, which enabled them to do some work there, that they didn't have to transport people off the Playa for. We had less transports this year. There were 28 ground and only five air transportations. As far as Washoe County goes, they patrol outside of the event [**UNINTELLIGIBLE 3:16:18**] and Highway 447. They reported eight misdemeanor citations and 14 arrests, and also NHP totals 447 and Highway I-80. They reported 137 citations. There were ten crashes, five of them were minor. They issued 242 warnings and only one arrest. We had some changes with the State Health Department as well. They added new regulation. They used to just require food permits for any camp that gave food away to anybody that wasn't in the camp. If you were publicly giving food to somebody else, even if you're not selling it, they require permits. This year, they had some concerns about some of the larger camps, where there were a hundred friends that are all sharing a large kitchen and they have one cook for the whole camp. They issued a new regulation where it's any large camp like that also has to get a food permit. This year, they issued 87 of those permits. They issued 52 the year before, and the health department was on-site, inspecting all of those facilities to make sure that

everything's okay and we didn't have any major problems there. This year, we worked a lot with Nevada Department of Transportation. We did a whole bunch of a programs to do several things. This year, for the first time, at the request of Washoe County Sheriff's Office, we reduced the speed limit in the town of Empire for the week before the event, the week during, and the week after. That was to deal with followings of potential accidents. A lot of people stopped at the Empire store. The park shoulder there is not very wide, and we've had concerned about people going there too fast, so they reduced the speed limit in that town. We also had our usual department to roadside cleanup and this year, we started to clean up earlier and had twice as many cleanup crews to clean up the roads afterwards. I did a DVD of the road before Burning Man and then after Burning Man. You can watch the DVD, it's actually cleaner afterward. We also cleaned up litter that was left there all year round. It starts fresh every year after the event, and then we clean up all the litter through the whole year, including from the event. We also got a permit to put a changeable message board at the intersection of Highway 447, near I-80 in Wadsworth, to let people know that the event was sold out for the first time. That was reduce the fact that, on the corridor, reduce the risk of accident and to save people some time of having to drive all the way there and then having to turn around. We're still waiting on reports from Pyramid Lake Paiute Tribe and also from Uruguay Mansion I understand that the report is coming pretty soon. Did you have anything you wanted to add?

TIME: 3:18:55

WILL PETERSON:     The FAA gave the airport an A rating. It's an interesting airport. We had over 2,000 operations, that's landings and takeoffs at Burning Man. We had a 150 planes tied down. We're getting more corporate planes and bigger planes, and the airport is a wonderful

place. I think it's been really good. The artwork produced for Burning Man this year has received national and international acclaim. It's considered now its own genre in the art world, and I have discussed with some of the citizens here in Lovelock about putting some artwork along the highway. We have a great, long park there that is just waiting for some artwork that we can see from Friday and get people off the highway and into town. There's a program I'm working on, through our nonprofit organization, called Big Art for Small Towns, and Lovelock and Gerlach are two towns we're aiming at first. You'll be hearing more about that in the future. As soon as I can get some fundraising legs underneath the nonprofit, we'll be doing that. We have a friend who's doing the nonprofit, and it's taking a lot to set up and have some programs to help some small annuities.

From the board's perspective, we think that we continue to learn and work with the agencies, all of the people that are responsible for making Black Rock City the incredible artistic and family place that it is, and we feel that this was the most successful event that we've ever had. Of course, we want to make it better, so that's our goal. With your cooperation, all the agencies we feel we can cooperate with. Thanks for being part of the best Black Rock City ever.

DARIN BLOYED:     Thank you. Any questions?

TIME: 3:21:10

CAROL SHANK:      We know that you do a really good job of cleaning up and putting everything back. It's amazing to me, that you can do that with that many people. I haven't even been out there, but just knowing what it must be like. I know how hard it is to keep my own house clean.

RAY ALLEN:        We helped BLM create the standard for cleanup of commercial events on public lands. I was very grateful to be part of that initiative, and this year we exceeded our standard from last year.

We exceeded it five points more. That's a small factor, but to me, it's one of the most important things that we do. If you go out to the Black Rock Desert right now, you will see no evidence of the city of 50,000 people. To me, that is a miracle.

PAT IRWIN:          The number of transports and ground transports that you reported this year, did you have last year's numbers too, that you could show how that happened?

WILL PETERSON:   I don't have them, but I can get them to you. There were some two-thirds less, and that's because of the equipment that the new hospital brought up, to be able to do diagnostic stuff on-site.

PAT IRWIN:          I have talked with St. Mary's Nevada, Northern Nevada hospital as well. It's renowned, and they are very appreciative of the change, because they were getting inundated with what they considered nuisance transports. We were exploiting their system where they couldn't take care of our community, so they appreciated the change that was made. Also, Carol, if you would, I have done an offer, and I failed to do it in my own notes, that I needed to get Jerrie Tipton's number from Mineral County. If you could give him the telephone number for the county office for Jerry Tipton. That was in regards to the other issue I had stated from their county's perspective of the cleanup. It was from Mineral, Hawthorne there.

CAROL SHANK:    I know who you're talking about. You did a good job.

DARIN BLOYED:   You're driving back today?

RAY ALLEN:        Yeah. I think Will's going to stay up in Nevada for some meetings. Ms. Wesner, could you add us to the distribution list for the **[UNINTELLIGIBLE 3:23:49**]? We were on there for a while, and we just haven't seen anything lately.

WILL PETERSON:   I saw the last one, and it had your name on it.

RAY ALLEN:        I'll write down what the address is. Do you send it electronically or do you send it by mail?

PAT IRWIN:          We send it by fax.

TIME:3:26:18 - Burning Man staff & ACLU exit


END ITEM 19: BLACK ROCK CITY LLC/BURNING MAN UPDATE ON 2011
                          BURNING MAN EVENT

DARIN BLOYED:       Okay, let's go back to item 16, correspondence.

CAROL SHANK:        I think what we had was just an email. Thank you very much for
                          earlier.

DARIN BLOYED:       What's the other? Do you guys want to keep going? We've got that
                          2:00, and we've got to absolutely have that start on time. Do you
                          want to finish with doctors, and then what time left, we'll have
                          lunch or something? Does that work for everybody?

CAROL SHANK:        Can we finish before, and then lunch?

DARIN BLOYED:       Alright, so item 20 is approval of vouchers.

PAT IRWIN:          I'm going to be telling Chad that we didn't approve his 5,000
                          vouchers. All in favor, say aye.

CAROL SHANK:        Aye.

DARIN BLOYED:       He always reminds us. Vouchers, I'm going to open the meeting
                          back up. The chair would entertain a motion to approve the
                          vouchers.

PAT IRWIN:          Motion to approve the vouches with the exception of 836, which
                          we need to change the name on the registry.

JIM SHIRLEY:        But it will be approved, upon changing the name?

PAT IRWIN:          It will be. It is, once we change it.

TIME: 3:28:55

BEGIN ITEM 21: REPORT FROM LEGAL COUNSEL

DARIN BLOYED:       Motion carried? Aye. Motion carried, thank you. Can we get a
                          report from legal counsel?

JIM SHIRLEY:        I talked to Pat yesterday. We have legal work tomorrow. I'm not
                          sure what works with you guys. I don't know who wants to be
                          there to represent us.

DARIN BLOYED:      You?

JIM SHIRLEY:        I'll be there.

DARIN BLOYED:      Well, I can't be there.

PAT IRWIN:          I'm going to try to be there. I've got to be in Carson City anyway,

                    and it's at 11:30, so I'm just going to take an early lunch.

JIM SHIRLEY:        We have a total of fifteen minutes for our side, and Evenson will

                    get a good portion of that.

DARIN BLOYED:      I get to watch you. I should be there, I talk faster than you.

JIM SHIRLEY:        Sold! You know what Pat pointed out in the meeting, that there is a

                    statutory provision. That contract is basically illegal after 2005.

                    Any contract subsequently is illegal as well, extended upon your

                    terms. The time you can go beyond your terms are when you

                    purchase something on credit. Those types of things can go

                    through government finance.

PAT IRWIN:          Jeff brought it up as well, correct?

JIM SHIRLEY:        Yes.

KAREN WESNER:     He said that we should know.

DARIN BLOYED:      We should know, and if that's the case, then how does that

                    Gallagher comment come in? The Gallagher comment? You put it

                    in the stinking ordinance.

JIM SHIRLEY:        Oh, I did? This isn't the ordinance.

DARIN BLOYED:      That's why you didn't put it in the ordinance when you guys

                    changed it.

JIM SHIRLEY:        Should we not do a five-year contract?

PAT IRWIN:          You can't.

JIM SHIRLEY:        So we should do a four-year.

PAT IRWIN:          We have an agreement that you can extend it to the fifth year, upon

                    everybody's agreement.

JIM SHIRLEY:        Perfect, because that's where I was going. I think we could do a

                    fifth year, but it has to be reassessed in the fourth year.

DARIN BLOYED:     I'm not worried about the contract. I'm not worried about - I've already told that the NRS 244 119, I think it is, give you the power over 1,000. Chapter 268 sets forth that the city has its own jurisdiction over outdoor assemblies over 1,000. Those are the two issues that the ACLU has.

JIM SHIRLEY:      They are non-issues.

DARIN BLOYED:     Well, what about the constitutionality of the kids?

<mark>TIME: 3:30:55</mark>

JIM SHIRLEY:      The constitutionality of the kids, what they're arguing, is the nuance of what you're telling you and what they're not telling you is that Chapter 201, what they cite in the NRS, is a criminal provision. If we want to charge Burning Man for allowing the minors to see pornography or whatever goes on out there, or if they're wanting to charge parents, then that would be an issue. That's not what we're doing. You can't have the event with children going to it, because of the nudity. Regardless whether they're fighting all that out, I showed every one of you this other provision, and it's a state law that we can put under conditions to protect the health, safety and welfare for participants and even for people that aren't. I think you could strike a middle ground that said any kids out there have to be like the airport, outside of the actual event. If they wanted to bring the kids in to see the art, they could have a special morning when they do that, and they tell all the participants, "If you don't have clothing on, you can't be out where the art is at this time." The problems are more than nudity, and when I talked to Pat yesterday, one of the problems that we have is if you take a kid out to see an art piece, and when I went there, I'm sorry, but I saw lots of men without their pants on.

DARIN BLOYED:     That one's all over the board. I think that one gapes open. It's there.

49

JIM SHIRLEY:     The guy comes walking along without his pants on. He could be arrested for indecent exposure of that minor child. I'm just saying, to protect the participants, I'm not sure that you can walk amongst the adults without being charged.

PAT IRWIN:       One of those things I brought up with Jim was how do nudist colonies get away with, and he says that a separate type, that they have a permit and license to do that type of environment. That's what is what's almost qualified for, is it's completely enclosed. You can't get in and be a participant without going through some scrutiny

TIME: 3:33:33

JIM SHIRLEY:     Then you go to the second layer. The second layer is that you have rampant drug use, you have alcohol being served - and I know Pat, you've discussed that they have the little bracelets, but I'm the adult. I can give the bracelet to my child, DARIN BLOYED, and he can go run and get the alcohol under 16 or 17, and they're not going to question that. There's a whole litany of things, with the alcohol and the drugs. How many police reports have I seen, of people having sex just out on the Playa? All that kind of stuff, it can happen.

CAROL SHANK:    If we limited the children to outside of the event, they'd have to have a separate?

JIM SHIRLEY:     I think we can come up with a safety plan.

PAT IRWIN:       I think this is where, if we chose, to sit back and debate on how to compromise, they would move Kidsville to a different area. They could move it out. They could make it outside the entrance, but now it becomes an issue as to how those people come into the Playa itself, and do what he's talking about. I think that even if we did an outside event, where they're roped off in some way, that they're still going to have some problems with having timed slots or anything else. That's the part of the negotiation that wouldn't

|                   |                                                                              |
|-------------------|------------------------------------------------------------------------------|
|                   | happen outside of this. If we pulled back a portion of it that you and I talked about completely out of there, and you're dealing with the drugs, the unsafety, alcohol, everything else that goes as part of that, that's already in the ordinance. We leave that alone, and the bottom line is we can still deal with the compromise of how we deal with the kids on the side part. I'm right there with what you and I talked about. Pulling that out takes away all of the issues, and we still have the ability to deal with that, based on the organizers. |
| DARIN BLOYED:     | What they said today was pretty key. It's blocked-off. The kid camp is blocked off, it's not walled off, and so you have that guy walking through, completely naked. |
| PAT IRWIN:        | They also separated them, in that article. They just pick up trash, so he was thinking he was doing something good. Those guys do that all the time. You see these guys going through here, that's just their culture. It's just their way of doing things. That's exactly right. That's was not a flagrant event, maybe, maybe not. I don't know, I wasn't there. The way that article was written, it wasn't. |
| DARIN BLOYED:     | It makes you wonder, it's a week-long event and that gal was in that camp for a half an hour.  Someone tells me is that it's happened more than once. |

TIME: 3:36:25

|                   |                                                                              |
|-------------------|------------------------------------------------------------------------------|
| PAT IRWIN:        | Oh, it happens all the time, and when they do the parade that they come through everybody's camped at, I know they avoid those. Certain things avoid those. Once they get to the flag site, they go by it and go around it, but they can see things fairly decently. |
| CAROL SHANK:      | Does the ordinance say something to the effect that any event needs to comply with county and state laws? |
| JIM SHIRLEY:      | The ordinance says that.                                                     |
| CAROL SHANK:      | Does it say that?                                                            |

DARIN BLOYED:    I'm hoping we can come to some kind of conclusion and agreement on this, because the reality is it could very easily end up in court. I'm not willing to stand down this time.

PAT IRWIN:    Here's my question, though, Darin, is if we do change this or add verbiage to it, and I think you can probably answer this, we can still vote on any change, at this point? If we change any portion of this, it's completely fine and in our realm to remove a paragraph, add a paragraph, even though it's not publicized or printed out for everybody to see?

DARIN BLOYED:    I think at the workshop, we could. We can do it in a public meeting. There are certain portions you have to have in there by state law, which are pretty well in there. The nudity was just an idea that to try to deal with the issue. And you know it's rape and **[UNINTELLIGIBLE 3:38:06]** and stuff, I think you can deal with **[UNINTELLIGIBLE 3:38:10]**, and we need to probably add to one state law, but you already have the catch-all.

PAT IRWIN:    But in the state law, it actually talks about communication. If you take that verbatim, it's moving into this law. That's a good idea.

CAROL SHANK:    In state law, it says too, we're supposed to have a public hearing before we permit an issue.

JIM SHIRLEY:    Yes, and you can't get away with that without the agreement. Okay, anything else? None of you were on the board when that happened.

DARIN BLOYED:    I was.

JIM SHIRLEY:    You were in on 2005, but those negotiations had already taken place before you came on. So you got to take away your apology.

DARIN BLOYED:    You know, being that new and not knowing, **[UNINTELLIGIBLE 3:39:15]** spoke to that effect, but they read along the lines and we all went. I think if I would have had more knowledge, I would have stood on my two feet and said, no, this is

|  |  |
|---|---|
|  | wrong and we're going with the ordinance, with the way it's written. |
| PAT IRWIN: | To DARIN BLOYED's defense, I love Dave to death, but he was so deathly afraid to  be sued that [**UNINTELLIGIBLE 3:39:43**]. This was after the event, that David was deathly afraid of their attorneys, and I actually had to go through the minutes, Dave and I went to grounds a little bit on the preemption, and I wasn't factoring in when they went to the event and those kind of things, but I was still pretty new. They tried to work something out. I want you guys to take action, and I'm just trying to support it. These two weren't on there, but when you guys did the Alarella thing, I was against banning the zoning, but you chose to do it and I'll defend it. |
| DARIN BLOYED: | Well, you do say it right, too. When asked why the defendant had a change of heart at this point, I tried to explain my side of it, but you hit me on the head. We're at the end of our agreement. This is our chance to restructure, and I think it's important that we do just that. Again, I'm hoping for some kind of agreement, but if they're going to try and pull out everything we're trying to do, I'm not supporting it. Just from my standpoint, my issues with the liability accounting, I think that's a huge one. |
| PAT IRWIN: | I think it's a win-win. Burning Man won't have to pay our costs if they just do it as a tax return. |
| DARIN BLOYED: | Ray asked me that, and it took me off-guard a little bit. I was over with my wife in Dalen and got a phone call from him about this issue, and they said, "Well, here's my feelings on it," and they asked me to work together, but I feel very adamant about my side of it. He said, "Well, how much is it going to cost us?" I mean, it took me off guard. To me, it's not all about money. It' wasn't the county's getting rich quick scheme formula. |

PAT IRWIN:          This was strictly protection. That's not even close to being rich.
                    They can move their event.

DARIN BLOYED:       He also said, "If we get away with nudity, can we keep the kids?" I
                    said, first of all, we can't police the nudity. That's not going to
                    happen. We don't have enough officers out there to do it. It's going
                    to happen, but that doesn't take away the threat. If they're still
                    doing drugs and they're still drinking and that kind of stuff...

CAROL SHANK:        Like you're talking about, not checking the cars on the way out.
                    It's not a nudity issue.

DARIN BLOYED:       No, but they don't do that, and I think that's important. It's a real
                    fear.

CAROL SHANK:        If they searched the cars coming in, how are the drugs getting in
                    there in the first place?

DARIN BLOYED:       They don't search for that.

CAROL SHANK:        They're searching for people.

PAT IRWIN:          That's the other thing. You go in there, and if it's a warm day, the
                    greeters are standing out there naked, and you've got kids in the
                    car. Oh, yeah, absolutely.

MAN 3:              In fact, if it's your first time in there, they'll give you a hug.

JIM SHIRLEY:        If you have to go out there, go the other way.

MAN 3:              We come in a separate entrance. We don't go through all that, but
                    we'll make Carol go through it.

CAROL SHANK:        No way. So Jim, there was a question about the rental agreement
                    for Imlay, for the house. Rachel said she hadn't seen it yet. They
                    were just back.

PAT IRWIN:          I guess it's been an issue before.

JIM SHIRLEY:        They never would ask me for Chad.

CAROL SHANK:        They were saying we should have.

PAT IRWIN:          That's where it came up.

CAROL SHANK:        Yeah, they're saying we should have had. When are going to have
                    the Imlay?

PAT IRWIN:            Doesn't she already have one?

CAROL SHANK:         Not Imlay.

DARIN BLOYED:        We want do one to try and spike some interest in their board. Nobody on that board...

PAT IRWIN:            Because of what we've got going on here in December, I say we wait until January for that one.

CAROL SHANK:         We'll have the town hall meeting here in January at some point.

PAT IRWIN:            We'll wait till next year, but any of those people that put in for re-ups on their terms, we'll know who those are, too. We'll know what we've got.

KAREN:               There's two that their terms expire in December. One of them doesn't want their, the last term that he did.

DARIN BLOYED:        Let's go back to item, just so we're for the record, item 6D. Jim Shirley is just returning for an update./AT/jf/ls

END ITEM 21: REPORT FROM LEGAL COUNSEL