UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | |
| Plaintiff, | ) | 3:12-cv-00435-RCJ-VPC |
| vs. | ) | **ORDER** |
| PERSHING COUNTY BOARD OF COMMISSIONERS, et al., | ) | |
| Defendants. | ) | |

This action—brought by the organizer and promoter of the "Burning Man" event against the Board of Commissioners (the "Board") of Pershing County, Nevada (the "County") and five individual Defendants in their official capacities—seeks injunctive and declaratory relief establishing that a County ordinance applicable to the Burning Man event is unconstitutional under the First Amendment. Defendant Jim Shirley has moved for summary judgment (ECF No. 76), and Plaintiff Black Rock City has moved the Court to dismiss and to retain jurisdiction over a settlement agreement (ECF No. 95). For the reasons given herein, the Court grants the motion for summary judgment, and denies the motion to dismiss.

I.     FACTS AND PROCEDURAL HISTORY

a.   Relevant Background

Plaintiff Black Rock City LLC ("Plaintiff" or "BRC") is the organizer of the Burning Man event (the "Event"), which has been held in the Black Rock Desert of northern Nevada since 1991. (Compl. ¶ 2, Aug. 16, 2012, ECF No. 1). The Event is an annual gathering of over 50,000 people into an "experimental community." (*Id*. ¶¶ 3, 22). Plaintiff designs and maintains a temporary "city" for each annual event with over 600 "theme camps" funded and created by Event participants, including large artistic displays, some with participatory elements. (*Id*. ¶ 23).

Every year since 1991, with the exception of 2007, the Event has taken place on federal land administered by the Bureau of Land Management ("BLM"). (*Id*. ¶ 4). Accordingly, since 1992 the organizers of the Event have conducted it pursuant to a BLM permit (the "Permit") that specifies Plaintiff's rights and responsibilities with respect to safety, security, fire protection, and emergency services. (*Id*. ¶¶ 4, 28). The Permit requires Plaintiff to pay actual costs, including those incurred by state and local agencies, and it directs Plaintiff to contact the Pershing County Sheriff's Office ("PCSO") for law enforcement services. (*Id*. ¶¶ 4, 28–29). From 1995 until 2005, Plaintiff paid the BLM a flat fee based on attendance at the Event. (*Id*. ¶ 30). In 2006, the BLM imposed a different calculation, charging for actual costs, i.e., the reasonable, documented costs of services provided by other agencies according to BLM cost recovery guidelines. (*Id*. ¶ 31). However, rather than contracting with local agencies itself and requiring Plaintiff to reimburse it, the BLM required Plaintiff to contract with local agencies directly. (*Id*. ¶ 31). As a result, between 2006 and 2011, Plaintiff contracted with PCSO to pay PCSO's actual expenses for Event related law enforcement and judicial services. (*Id*. ¶ 32). From 2006 to 2011, the respective expenses were $66,000; $110,000; $148,500; $156,000; $166,000; and $175,000. (*Id*.). The agreement with PCSO required the County to provide documentation of actual expenses after each year's Event. (*Id*. ¶ 33). The documentation provided after the 2011 Event indicated only $120,000 in actual law enforcement expenses, despite a bill of $154,000 for law enforcement (plus $14,000 for prosecution costs and $7,000 for vehicle usage). (*Id*. ¶¶ 32–33). The County has never provided any itemized bill for judicial expenses as required under the agreement. (*Id*. ¶ 33).

As a general rule, Nevada requires each of its counties to adopt an ordinance to regulate and license outdoor assemblies of over 1000 persons. (*See* Nev. Rev. Stat. § 244.354; Compl. ¶

37). Counties may regulate for law enforcement presence, drinking water, sewage, food, toilets, medical facilities, parking space, camping facilities, indemnity or performance bonds, fire protection, financial statements, and communication systems. *See* Nev. Rev. Stat. § 244.3545(1)– (12). Counties may also regulate for "[o]ther conditions determined by the board to be necessary to protect the health, welfare, and property of local residents and persons attending the assembly." *Id*. § 244.3545(13). Pershing County's relevant ordinance (the "Festival Ordinance"), as amended in 2004, required promoters to pay a fee to the County to obtain a license (the "Festival License") to hold any event attended by over 1000 people. (*See* Pershing Cnty. Code § 5.16.020; Compl. ¶ 38). In order to avoid litigation over the Festival Ordinance, Plaintiff and the County entered into agreements in 2005 and 2011 providing that the County would not apply the Festival Ordinance to the Event in exchange for Plaintiff's donations to the County and local charities. (Compl. ¶¶ 5, 40–42). The donations were to begin at $40,000 per year, increasing with attendance at the Event according to a specified formula, with 75% paid directly to the County and 25% paid to nonprofit groups within the County that serve the County's residents. (*Id*. ¶ 40). The County's portion of the payment was for any unspecified additional expenses the County might incur due to the Event. (*Id*.). The first agreement was signed on behalf of the County on November 14, 2005 (the "2005 Agreement"). (*Id*.). The 2005 Agreement required the County:

> to amend the current Pershing County Festival Ordinance such that it implements this Agreement. The County also agrees not to enact any other similar legislation that would tax or require Black Rock City to pay any festival, assembly or use fees to the County unless a state or federal law/statute requires such enactment of an ordinance, at which time the County will give notice and have an open meeting discussion with Burning Man.

(*Id*. (quoting 2005 Agreement ¶ 3, Nov. 14, 2005, ECF No. 1-8)).The 2005 Agreement was to remain in effect "as long as the Burning Man Event is held in Pershing County." (2005 Agreement ¶ 4). At the request of the County, the parties revised the agreement effective January

27, 2011 (the "2011 Agreement"). (*See* 2011 Agreement, Jan. 27, 2011, ECF No. 1-9). The 2011 Agreement required fixed payments of $50,000 to the County and $12,000 to local charities. (Compl. ¶ 41). Like the 2005 Agreement, the 2011 Agreement was also to continue "as long as the Burning Man Event is held in [Pershing] County." (2011 Agreement ¶ 3). And, like the 2005 Agreement, the 2011 Agreement also contained a clause preventing its circumvention via legislation or regulation:

> As long as this Amended Agreement is in effect, the County agrees not to enact any future, or modify any existing, rule, ordinance, policy or regulation in a way that would result in the taxation, assessment or charge against [Black Rock City] in connection with holding the Burning Man Event on Federal land within County boundaries.

(Compl. ¶ 42 (quoting 2011 Agreement ¶ 1)). Plaintiff alleges that it has complied with the 2005 and 2011 Agreements. (Compl. ¶ 43). Nonetheless, the 2011 Agreement has collapsed. (*See id.* ¶¶ 6–11).

As alleged in the Complaint, in November 2011, Defendant Pershing County District Attorney James Shirley advised a BRC representative that Judge Richard Wagner of the Sixth Judicial District Court had asked Shirley to draft a proposed amendment to the Festival Ordinance to make it applicable to the Event. The amendment was to include new fees and subject the Event to local regulations, including laws related to child welfare. (*Id*. ¶ 45). Plaintiff alleges that Judge Wagner was motivated by content-based animus against the Event. (*See id*. ¶ 46). The Board held a public hearing on the proposed amendment on November 16, 2011, and Plaintiff's representatives attended and voiced their opposition. (*Id*. ¶ 47). Shirley and Defendant Commissioner Darin Bloyed spoke in favor of enforcing state laws prohibiting minors from attending the Event. (*Id*. ¶ 48). Judge Wagner spoke in support of the amendment and against the Event in general, allegedly expressing a view that some of the content at the Event was "lawless"

and "lewd[]," and that minors should not be exposed to it. (*Id*. ¶ 49). At a special meeting of the Board on November 30, 2011, Defendant Chairman of the Board Pat Irwin and Defendant Vice-Chairman of the Board Carol Shank stated that state laws should be enforced to prohibit minors from attending the Event. (*Id*. ¶ 51). On February 1, 2012, the Board adopted amendments to the Festival Ordinance (the "February Amendments") and set a permit fee that would charge applicants $1.50 per person per day. (*See id*. ¶ 52). The 2013 Event would have been the first Event to which the February Amendments applied. (*See id*. ¶ 53).

On June 12, 2012, the BLM issued a Permit for the 2012 Event, again requiring Plaintiff to enter into an agreement with the County for law enforcement services. (*Id*. ¶ 54). Plaintiff had already encountered trouble negotiating with PCSO by that time. (*See id*. ¶¶ 55–59). On March 15, 2012, the County informed Plaintiff that six additional deputies would be needed, increasing the law enforcement costs to $180,000 for the 2012 Event. (*Id*. ¶ 55). On March 20, 2012, the County informed Plaintiff that the law enforcement budget had been increased again, to $282,000, because several commissioners decided to double the law enforcement presence in an effort to protect any children at the Event. (*Id*. ¶ 56). On April 20, 2012, Shirley and Defendant Pershing County Sheriff Richard Machado gave Plaintiff a revised budget of $428,384 for law enforcement, $25,000 for judicial services, $5,000 for recording and secretarial services, and a $20,000 "contingency fee." (*Id*. ¶ 57). On May 1, 2012, the County gave Plaintiff yet another revised budget, reducing the law enforcement costs to $346,700, but retaining the additional $50,000 in fees included in the previous proposal. (*Id*. ¶ 58). Representatives of the County then told Plaintiff's representatives that the County intended to repudiate the 2005 and 2011 Agreements. (*Id*.). At Board meetings held on May 2, 2012 and May 14, 2012, Plaintiff told the Board that it would not sign any law enforcement agreement in which it agreed to repudiate the

2005 and 2011 Agreements. (*Id*. ¶ 59). The parties did not enter into any law enforcement

agreement in 2012; rather, the law enforcement expenses were made a part of the license fee that

the County charged to Plaintiff under the Festival Ordinance. (*See id*.).

Plaintiff cites to alleged public comments by Defendants indicating that they were

concerned over the legality of the amended Festival Ordinance, and that Defendants noted that

they might avoid complying with the 2005 and 2011 Agreements through "collusive" (Plaintiff's

words) litigation. (*See id*. ¶¶ 62–63). On May 16, 2012, Shirley filed a Petition for Writ of

Certiorari, Mandamus, and/or Prohibition (the "Petition") with the Sixth Judicial District Court.

(*See id*. ¶ 64). The "sham" Petition named the Board and the County as respondents and alleged

that they had breached their duties in various ways. Plaintiff was not made a party. (*Id*. ¶ 65).

The Petition asked the state court to order the commissioners to show cause why the court should

not order them to: (1) notify Plaintiff that it was required to file an application to hold the Event

in Pershing County; (2) notify Plaintiff that the Board could no longer perform under any

contract (such as the 2005 and 2011 Agreements) exempting the Event from the Festival

Ordinance; (3) notify Plaintiffs that the Board had exceeded its lawful authority in exempting the

Event under the 2005 and 2011 Agreements; and (4) that the creation of those contracts

constituted an abuses of the commissioners' discretion. (*Id*. ¶ 66). Shirley's personal affidavit in

support of the Petition was personally witnessed by Judge Wagner, to whom the Petition was

assigned without recusal, despite Judge Wagner's public statements in support of the

amendments to the Festival Ordinance, and his contemporaneous public statements allegedly

indicating bias against Plaintiff. (*Id*. ¶¶ 67–69). Judge Wagner granted the show cause order

without briefing. (*Id*. ¶ 70). In fact, Judge Wagner signed the order on May 15, 2012, the day

before Shirley filed the Petition. (*Id*.). There is no clerical error as to these dates, because the

clerk's date-time stamp indicates 10:01 a.m. on May 16, 2012 for both the Petition and the show cause order. (*Id*.). Plaintiff never had notice of the Petition. (*Id*. ¶ 72).

At a May 22, 2012 meeting set by the Board to discuss the Petition, the Board voted to implement the provisions in the Petition and signed a stipulation to do so without any discussion of whether they should challenge the Petition. (*Id*. ¶ 74). On May 24, 2012, Judge Wagner issued the writ granting the Petition. (*Id*. ¶ 75). On the same day, the County notified Plaintiff of its intent to repudiate the 2005 and 2011 Agreements and enforce the Festival Ordinance against Plaintiff. (*Id*. ¶ 76). Accordingly, Plaintiff alleges, it filed for a County Festival License under duress. (*Id*. ¶ 77).

As noted, *supra*, the parties did not enter into any law enforcement agreement in 2012; rather, the law enforcement expenses were made a part of the 2012 Festival License fee. (*Id*. ¶¶ 78–79). At the time of filing for the 2012 Festival License, Plaintiff allegedly believed, that the County would impose additional obligations and requirements inconsistent with its 2012 BLM Permit. For example, Plaintiff asserts, Condition 7 of the County's Festival License requires Plaintiff to comply with Nevada Revised Statutes section 244.3548(3)–(7), which prohibits, among other things, assemblies from constituting a public or private nuisance; exhibiting obscene, indecent, vulgar, or lewd exhibitions; permitting disorderly conduct; allowing illegal possession of liquor; and permitting illegal possession of controlled substances. (*Id*. ¶ 81). The 2012 Festival License also required Plaintiff to provide a trailer park, fuel, and telecommunications equipment for PCSO's use. (*Id*. ¶ 82). Plaintiff further alleges that with the February Amendments, the 2013 Festival License could impose even more fees. (*Id*. ¶ 83).

### b.  Procedural History

Shortly after obtaining its 2012 Festival License, Plaintiff sued the Board, Irwin, Shank, Bloyed, Shirley, and Machado in this Court on six causes of action for injunctive and declaratory relief, claiming: (1)–(2) that the Festival Statute, Festival Ordinance, and Festival License are preempted under the Supremacy Clause either on their face or insofar as they conflict with the BLM Permit; (3)–(4) that the challenged laws are invalid under the First and Fourteenth Amendments either on their face or as applied; (5) that the state court action involving Judge Wagner and related collusion violated Plaintiff's due process rights under the Fourteenth Amendment; and (6) that the repudiation of the 2005 and 2011 Agreements constituted a violation of either due process or the Contract Clause.  Plaintiff did not specifically list a breach of contract claim.  On April 26, 2013, this Court granted in part and denied in part Defendants' motions to dismiss. (Order, ECF No. 60). Specifically, the Court dismissed the preemption claims; the due process claims; and the facial First Amendment challenge as to some, but not all, of the provisions of the challenged laws. The Court also dismissed the sixth claim as to the Contract Clause challenge to the Festival Ordinance generally, but not as to the Contract Clause challenge to the economic effect of the repudiation of the 2005 and 2011 Agreements. The Court did not dismiss the as-applied First Amendment challenge to the Festival Ordinance, and it did not dismiss the facial challenge as to subsections 5.16.180(D)(4) and (5) of the Festival Ordinance. (*Id.*).

On July 31, 2013, Defendant Shirley filed the pending motion for summary judgment (ECF No. 76), to which Plaintiff has not responded. Instead, on October 2, 2013, the Parties entered into a Comprehensive Festival Ordinance Waiver, Law Enforcement, and Settlement Agreement (the "Settlement Agreement"), and on November 5, 2013, Plaintiff moved, under

Fed. R. Civ. P. 41(a)(2), to dismiss this action with prejudice, requesting that the Court retain exclusive jurisdiction to interpret and enforce the terms of the Settlement Agreement. (ECF No. 95). On November 25, 2013, the Court held a hearing on Plaintiff's motion (the "Hearing") and voiced numerous concerns with respect to the proposed Settlement Agreement and the conduct of the litigants and counsel. The Court now considers the pending motions.

## II.   Motion for Summary Judgment (ECF No. 76)

### a.   Legal Standard

Although Local Rule 7-2 provides that the "failure of an opposing party to file points and authorities in response to any motion shall constitute a consent to the granting of the motion," the application of the Local Rule must be compatible with the Federal Rules of Civil Procedure. *See Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir.1993). Specifically, in the summary judgment context, the application of LR 7-2 must not conflict with Federal Rule 56. *Id.*

Pursuant to Rule 56, summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. And all justifiable inferences must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. Thus, even where LR 7-2 is otherwise applicable, under federal

law, a motion for summary judgment cannot be granted unless the moving party meets its burden and the nonmoving party fails to demonstrate a genuine factual issue. *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003). In other words, a summary judgment motion "cannot be granted simply as a sanction for a local rule violation." *See Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995). Accordingly, the Court must consider the merits of the pending motion to determine whether Defendant Shirley has met his burden.

### b. First Amendment Claims

As an initial matter, Plaintiff has failed to file a response to the pending motion for summary judgment, and the deadline for doing so has long passed.[1] Although Plaintiff's counsel initially claimed, at the Hearing, that that the motion had been withdrawn, she later recanted, admitting that the motion had not been "formally withdrawn." However, even if the implied "informal withdrawal" had some legal significance, the motion is not Plaintiff's to withdraw; it is Defendant Shirley's, and Shirley has taken no action to withdraw it. Accordingly, the motion remains pending before the Court, and it is ripe for consideration. Moreover, a review of the merits reveals that Defendant Shirley has carried his burden with respect to each Plaintiff's remaining claims. Therefore, the motion is granted in its entirety.

Plaintiff's first remaining cause of action alleges that Pershing County Code ("PCC") subsections 5.16.180(D)(4) and (5) facially violate the First Amendment because they impermissibly restrict constitutionally protected expression. In its ruling on the motions to dismiss, the Court allowed this claim to survive based on the plain language of these subsections

---

[1]Shirley filed the pending motion on July 31, 2013. Therefore, absent an extension, Plaintiff's response was due on August 26, 2013. While the Parties stipulated to extend the deadline to October 11, 2013, the Court did not sign that stipulation. Nonetheless, even if the stipulation were operative, the deadline would have expired over two months ago, and Plaintiff has neither filed a proposed response nor sought an additional extension.

as they then existed. (ECF No. 60, at 12–14). However, the Pershing County Board of Commissioners has since amended PCC 5.16.180(D)(4) and (5) to include constitutionally appropriate standards, which resolve Plaintiff's first cause of action. The amended version, with the applicable changes in italics, provides:

D. It is unlawful for any applicant, employee, agent or person associated with the applicant, to do any of the following:

1. Conduct or operate a festival, assembly, or event without first procuring a license to do so;

2. Sell tickets to a festival, assembly, or event without a license first having been obtained;

3. Operate, conduct or carry on any festival, assembly, or event in a manner to create a public or private nuisance;

4. *Allow any exhibit, show or conduct within the place of assembly event:*

*(a) Which a reasonable person, applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest; and*

*(b) Which actually involves or explicitly depicts or shows a patently offensive representation of:*

*(i) Ultimate sexual acts, normal or perverted, actual or simulated; or*

*(ii) Masturbation, fellatio, cunnilingus, bestiality, excretory functions, or lewd exhibition of the genitals or genital area; or*

*(iii) Violent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape or torture; and*

*(c) Which, when considered as a whole, and in the context in which it is used, lacks serious literary, artistic, political, or scientific value.*

5. *Allow any person on the premises of the licensed festival, assembly, or event to cause or create a disturbance by disorderly conduct which: (a) Endangers others or otherwise interferes with the surrounding property owner's quiet enjoyment of their property; (b) Involves fighting; (c) Involves challenging another person to fight; (d) Involves committing a breach of the peace; (e) Involves interfering with, annoying, accosting or harassing any other person which conduct by its nature would tend to incite a disturbance; or (f) Involves congregating with other*

*persons in a public place and refusing to comply with a lawful order of the police to disperse.*

This amended version regulates only unprotected expression. Therefore, as a matter of law, these subsections no longer support Plaintiff's facial challenge.

With respect to subsection four, the previous version provided simply that applicants may not exhibit, show, or conduct any "obscene, indecent, vulgar or lewd exhibition, show, play, entertainment or exhibit . . . ." The Court declined to dismiss the facial challenge to this version, explaining that "[a]lthough 'obscenity' is not constitutionally protected, *Roth v. United States*, 354 U.S. 476, 484–85 (1957), 'indecent' speech is protected, *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989), as is, presumably, speech that is 'vulgar' or 'lewd.'" In other words, the previous version facially prohibited protected categories of speech. The amended version does not; it reaches only unprotected "obscenity."

 An obscenity statute validly regulates unprotected expression when it follows the three-part definition of obscenity set out in *Miller v. California*, 413 U.S. 15 (1973). In *Miller*, the Supreme Court framed the test for ascertaining obscenity as "(1) whether 'the average person applying contemporary community standards' would find the work, taken as a whole, appeals to the prurient interest; (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value." 413 U.S. at 24.

The amended version of subsection four incorporates the *Miller* test word-for-word. Therefore, it does not reach protected speech, and Plaintiff's facial challenge to subsection four fails as a matter of law.

With respect to subsection five, the previous version prohibited applicants from allowing "any person on the premises of the licensed festival, assembly, or event to cause or create a

disturbance by offensive or disorderly conduct." In its previous Order, the Court also declined to dismiss a facial challenge to this provision. It reasoned,

> [l]est they prohibit substantial protected speech, "disorderly conduct" laws must generally be insulated by an internal requirement that the conduct threatens an immediate breach of the peace, a requirement notably absent from the present provision. See *United States v. Poocha*, 259 F.3d 1077, 1080 (9th Cir. 2001) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). "The Supreme Court has consistently held that the First Amendment protects verbal criticism, challenges, and profanity . . . unless the speech is 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" *Id.* (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (internal quotation omitted)). Furthermore, the provision here also prohibits a disturbance by "offensive" conduct. The Court cannot say that a facial challenge to such a law is not viable. A significant amount of protected speech may be prohibited by this provision in relation to unprotected speech.

(Order, ECF No. 60, at 13). Apparently addressing the Court's concerns, the Pershing County Board of Commissioners amended subsection five to include the necessary breach of the peace requirement and omit the reference to "offensive" conduct. The Court applauds this correction and finds that, on its face, the amended version reaches only unprotected "fighting words." *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (Unprotected fighting words are those "which by their very utterance inflict injury or tend to incite an immediate breach of the peace."). Therefore, the facial challenge to this subsection likewise fails as a matter of law.

Defendants are also entitled to summary judgment on the as-applied challenge, because Plaintiff has failed to establish that it is justiciable. Article III of the United States Constitution limits federal "Judicial Power," that is, federal-court jurisdiction, to "Cases" and "Controversies." This case-or-controversy limitation serves "two complementary" purposes. *Flast v. Cohen*, 392 U.S. 83, 95 (1968). "It limits the business of federal courts to 'questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process,' and it defines the 'role assigned to the judiciary in a tripartite

allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.'" *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Flast*, 392 U.S. at 95 (1968)).

"To satisfy Article III's case or controversy requirement, [Plaintiff] must establish standing to sue." *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010). "The irreducible constitutional minimum of standing contains three elements: the plaintiff must demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. " *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted).

The Plaintiff bears the burden of proof to establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. While "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," in responding to a summary judgment motion, "the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* Similarly, under the mootness doctrine, "[a]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002). Finally, because the court's role is "neither to issue advisory opinions nor to declare rights in hypothetical cases," the case or controversy standard also requires that a claim be ripe for

review. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing.").

Plaintiff's as-applied claim asserts that the various provisions of the Festival Ordinance are part of "an overarching scheme . . . directed at limiting protected expressive conduct." (Opp'n to Mot. to Dismiss, ECF No. 27, at 19). Specifically, Plaintiff argues that its pleadings with respect to the Festival Ordinance and License permit two plausible inferences: (1) "either the board hiked the fees based on its appraisal of the Burning Man Event's content," or (2) "the Board saw an opportunity to raise revenue for the County" at Plaintiff's expense." (*Id.* at 21). In either case, Plaintiff contends, "the underlying constitutional flaw is that the statute fails to properly cabin the Board's discretion." (*Id.*). While such inferences may be, and in this case have been, sufficient to establish standing for purposes of a motion to dismiss, they are not alone sufficient to survive a motion for summary judgment.

To the extent that the as-applied claim is directed at the County's licensing process for the 2012 or 2013 Events, Plaintiff has failed to adduce any evidence creating a material question as to whether it suffered an injury-in-fact under the First Amendment. Put simply, nothing in the record, other than the pleadings, provides a basis for concluding that Plaintiff actually paid fees in excess of reasonable County costs, let alone the inference that the allegedly excessive fees were motivated by a content-based animus or were intended to revenue.

The more salient defect, however, is that with respect to past Events, a favorable outcome on the as-applied claim will not redress the harm alleged. Indeed, Plaintiff filed the instant challenge seeking only declaratory and injunctive relief. Yet, even if Plaintiff prevailed in this endeavor, the relief requested would not redress harms allegedly caused by the application of the Festival Ordinance to the 2012 or 2013 Events. Those alleged violations, like their associated

Events, have come and gone, and the prospective relief sought will not remedy them. Therefore, to the extent that Plaintiff seeks prospective relief from injuries resulting from the 2012 or 2013 Events, the harm alleged is not redressable. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Because respondent alleges only past infractions . . . and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.").

With respect to future Events, Plaintiff merely prognosticates that County officials, when reviewing future License applications, will charge excessive fees in violation of the First Amendment. While it is certainly true that Plaintiff could establish standing to enjoin the County by showing that such violations are likely, *See Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983), and not merely "conjectural" or "hypothetical," *Lujan*, 504 U.S. at 560, this requires Plaintiff to "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true," *Id.* at 561, demonstrating the likelihood of future harm. Plaintiff has failed to do so,[2] and the Court must therefore conclude that Plaintiff lacks standing to maintain the as-applied challenge. Accordingly, the Court lacks subject matter jurisdiction to hear it.

### c.   Contract Clause Claims

Plaintiff's remaining Contract Clause claim also fails as a matter of law. In the Order on the motions to dismiss (ECF No. 60), the Court concluded the following with respect to Plaintiff's Contract Clause claims:

> In the sixth cause of action, Plaintiff alleges that Defendants violated the Contract Clause by repudiating the 2005 and 2011 Agreements, and that Defendants have breached those contracts under state law. The Court will not dismiss these claims.

---

[2] In fact, the record shows just the opposite. Specifically, it shows that Plaintiff obtained a fifty-year exemption from the Festival Ordinance weeks before the filing of the instant motion. *See infra* note 10.

"No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. "It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties. Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 (1977). The Contract Clause is no barrier to otherwise legitimate legislation concerning the public welfare that incidentally abrogates private contracts, so long as the "[l]egislation adjusting the rights and responsibilities of contracting parties [is] upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.* at 21–23. But when a state repudiates or impairs its own contractual obligations, the inquiry is different. *Id.* at 23. In the latter case, a court first asks whether the state's contract was valid in the first instance, i.e., whether the contract purported to bargain away the ability of future legislatures to exercise their police power. *Id.* ("In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."). However, economic agreements do not generally fall within the reserved-powers doctrine. *See id.* at 24.

The Court finds that Plaintiff has made out a prima facie case of a Contract Clause violation as to the repudiation of the 2005 and 2011 Agreements insofar as that repudiation stripped Plaintiff of the economic benefit of its bargain. The enforcement of the economic aspects of the Agreements does not implicate the ability of the Board to exercise its police power for the purposes of protecting the public welfare. *See id.* However, the Contract Clause and breach of contract claims are not viable as against the Festival Ordinance as a general matter. The Festival Ordinance is based upon the legitimate police power of the County, and the 2005 and 2011 Agreements' forbearance clauses cannot strip the County of this power.

(Order, ECF No. 60 16–17). A review of the pending motion and accompanying exhibits, however, reveals that the Court, through no fault of its own, incorrectly concluded that the repudiation of the 2005 and 2011 Agreements may have stripped Plaintiff of then-existing, enforceable economic rights—specifically, the bargained-for costs of law enforcement and other services established in the Law Enforcement Agreements (the "LEAs"). (*Id.*).

While the First Amended Complaint ("FAC") does state that the law enforcement costs were paid under "annual agreements,"(FAC, ECF No. 69, at 9–10), the Parties failed to explain that these were memorialized in five separate, written LEAs, each of which specifically details

the Parties' obligations with respect to law enforcement costs during the covered period, (*See* ECF No. 76-2, at Exhibits 6–7; ECF No. 76-3, at Exhibits 8–10 ).The Parties likewise failed to explain that the individual LEAs were temporally limited—with some operating for a single year and others operating for multiple years.[3] (*See id*.). For example, the 2011 Agreement specifically provided that it was to last for one year. (ECF No. 76-3, at 14). These individual LEAs are legal documents that stand on their own; they created annual and multi-year obligations not set forth in the 2005 or 2011 Agreements, and they were operative between 2006 and 2011. (*See Id.*) Thus, at the conclusion of the 2011 Event, when the 2011 LEA expired, the County had no further economic obligations with respect to providing law enforcement services. (*Id.*).

The primary question under the Contract Clause, however, is whether there was a change in the law that substantially impaired a party's *then-existing* contractual rights. *See Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) ("This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."). The answer, in the present case, is plainly no; there was no enforceable LEA or other costs contract in place at the time of the legislative changes.

The Festival Ordinance was amended to effectively repudiate the 2005 and 2011 agreements on February 2, 2012. (FAC, ECF No. 69, at 16; Amended Festival Ordinance, ECF No. 76-3, at Exhibit 12). Plaintiff alleges that, from March 15, 2012 until May 14, 2012, the Parties engaged in ongoing negotiations relating to a potential LEA for the 2012 Event. (FAC, ECF No. 69, at 17-18). Plaintiff also alleges that the negotiations ultimately failed because Plaintiff would not agree to provisions requested by Pershing County. (*Id.*). Eventually, Plaintiff

---

[3] The costs for law enforcement and other services were covered in the individual 2006, 2007, 2008, 2010, and 2011 LEAs. (*See* ECF No.76-2, at Exhibits 6-7; ECF No. 76-3, at Exhibits 8-10 ).

refused to have law enforcement costs covered by an LEA in 2012. Thus, Plaintiff's own pleadings establish that that the February Amendments could not have interfered with any then-existing, enforceable contractual rights arising from an operative LEA. There was simply no operative LEA, or any other legally enforceable agreement, at the time of repudiation.[4] Instead, according to Plaintiff's own pleadings, the repudiation of 2005 and 2011 Agreements merely caused negotiations for a future LEA to fail. Such allegations will not support a claim under the Contract Clause. Accordingly, the remaining Contract Clause claims fail as a matter of law. Thus, none of Plaintiff's claims survive Defendant Shirley's motion for summary judgment (ECF No. 76), and it is therefore granted in its entirety.

## III.    Motion to Dismiss and to Retain Jurisdiction (ECF No. 95)

Plaintiff has moved the Court to dismiss this action with prejudice while retaining jurisdiction to enforce the terms of a settlement agreement. Specifically, Plaintiff asks the Court to retain jurisdiction, for a term of ten years, over the Comprehensive Festival Ordinance Waiver, Law Enforcement, and Settlement Agreement (the "Settlement Agreement" or "Agreement") reached by Plaintiff and Defendant Pershing County. Having reviewed each of the pending motions and related briefs, the record herein, and having held oral argument, the Court emphatically declines to do so, and instead finds that the Settlement Agreement is illegal and unenforceable, and that it is the product of an abuse of judicial process and a fraud committed on this Court, the Pershing County Board of Commissioners, and the Nevada Legislature. The Court's specific findings of fact and conclusions of law with respect to each of these issues are articulated below:

---

[4] This is true even if, as Plaintiff claims, repudiation legally occurred on May 24, 2012, when Pershing County notified Plaintiff that it was withdrawing from the Agreements, instead of on February 2, 2012, when the Festival Ordinance was Amended.

### a. The Illegality of the Proposed Settlement Agreement

The Proposed Settlement Agreement is illegal; it is unenforceable, and it is absurd. Plaintiff moves the Court to retain jurisdiction to enforce it, and therefore seeks the Court's tacit approval of its terms. In light of the following illegal provisions, among several others, the Court will not grant such approval[5]:

Section 5.1 provides: "County agrees that for the duration of this agreement, it shall not attempt to separately regulate any matters addressed by the BLM permit, including without limitation the use of alcohol and the presence of children at the Event." (Settlement Agreement, ECF No. 97-1, at 7). This attempted abdication of Pershing County's regulatory authority is unquestionably illegal, and therefore unenforceable. It implies that the County cannot prevent minors from attending the Event, even when state and local laws concerning child endangerment, child delinquency, or child trafficking are implicated. Under the plain terms of this provision, were it enforceable, Plaintiff could prevent the County from discharging its obligation to enforce applicable state laws relating to the safety of children. Such a contract is obviously illegal, and no court would enforce it. Moreover, its enforcement is preempted by the BLM permitting scheme, which mandates that "[s]tate and local laws and ordinances shall apply and be enforced by the appropriate [s]tate and local authorities." 43 C.F.R. § 8365.1.[6]

---

[5] The Court's list of illegal provisions is only illustrative; it is not intended to identify each and every defect in the Settlement Agreement.

[6] Specifically, 43 C.F.R. § 2933.31 provides that a Special Recreation Permit Holder must comply with all the "general rules of conduct contained in subpart 8365 relating to public safety, resource protection, and visitor comfort." Similarly, 43 C.F.R. § 2933.32 provides that a Special Recreation Permit may be revoked if the permit holder "commit[s] any of the acts prohibited in subpart 8365." Finally, 43 C.F.R. § 8365.1–7 (i.e. "subpart 8365") provides in pertinent part that "except as otherwise provided by Federal law or regulation, State and local laws and ordinances shall apply and be enforced by the appropriate State and local authorities." The plain language of

The Parties, however, claim that recently enacted state law, Nevada Assembly Bill 374 ("A.B. 374"), expressly legalizes exemption agreements of this kind. Preemption issues aside, the parties are mistaken, and they have misinterpreted the statute.

A.B. 374 deals with county-granted exemptions from ordinances adopted pursuant to NRS 244.354, which requires each of Nevada's counties to adopt an ordinance to regulate and license outdoor assemblies of over 1000 persons. It provides, in pertinent part:

> 1. A board of county commissioners may enter into an agreement with any person or organization described in paragraph (b) to exempt from the provisions of any ordinance adopted by that board of county commissioners pursuant to NRS 244.354 and the provisions of NRS 244.354 to 244.3548, inclusive:
>
> (a) Any assembly occurring on federal land for which a federal agency issues a license or permit or otherwise authorizes the assembly; and
>
> (b) The person or organization that permits, maintains, promotes, conducts, advertises, operates, undertakes, organizes, manages or sells or gives away tickets to any such assembly.
>
> 2. In determining whether to enter into an agreement pursuant to subsection 1, a board of county commissioners may consider, without limitation, whether a person or organization described in paragraph (b) of subsection 1 has demonstrated to the satisfaction of the board that:
>
> (a) The federal agency that issues a license or permit for or otherwise authorizes an assembly described in paragraph (a) of subsection 1 has ensured that conditions which otherwise may be imposed by the board pursuant to NRS 244.3545 are addressed during the process of issuing the license or permit for or otherwise authorizing the assembly; and
>
> (b) The assembly will not present an unreasonable danger to the health or safety of any resident of the county.

The Parties apparently believe that this gives County officials carte blanche to dispense with local enforcement of all provisions of its Amended Festival Ordinance, including those that

these federal regulations mandates that local authorities, in this case Pershing County, enforce applicable state and local laws pertaining to the presence of children at the Burning Man Event.

mirror or incorporate state laws dealing with the safety and welfare of children. This is incorrect. While the Court recognizes that A.B. 374 includes the permissive "may" before describing what the County *should* consider prior to entering an exemption agreement, the Court cannot conclude that this permissive construction simply allows the County to entirely ignore, let alone contradict, A.B. 374's enumerated considerations, particularly subsection 2(b), which directs the County to consider whether the party seeking an exemption "has demonstrated to the satisfaction of the board that . . . [t]he assembly will not present an unreasonable danger to the health or safety of any resident of the county." This, however, is exactly what the County has done; it has attempted to exempt Plaintiff from relevant provisions of its Festival Ordinance despite its apparent conclusion that the Event presents an unreasonable danger to minors. (*See* Mins. of Public Hr'g, ECF No. 69-1, at 144–198). The Court rejects the proposition that A.B. 374 contemplates such results.

The "Integrated Command" provisions, Sections 1.9 and 3.1, are similarly unenforceable. Section 1.9 provides:

> Integrated Command means a system of law enforcement at the Event which provides for the command, control, and coordination of emergency response to incidents that occur at the Event. Under the Integrated Command structure, the BLM and the Sherriff's Office provide a coordinated response to situations at the Event. Each agency is responsible for the enforcement of specific laws pertaining to their specific jurisdictional oversight (BLM—federal and Pershing County Sheriff's Office—State). The Integrated Command occurs during the set period of time coinciding with the Event in the geographical area of the Event. The number of officers needed for policing the Event is determined through a cooperative effort between the BLM and the Sheriff's Office, *with input from BRC*.

(Settlement Agreement, ECF No. 97-1, at 4) (emphasis added). Section 3.1 provides:

> The County will provide for the enforcement of state and local laws at the Event pursuant to the BLM permit, as part of an Integrated Command with BLM law enforcement personnel or, if both BRC and the County agree, as a Separate Command. If BLM refuses expressly and in writing to conduct an Integrated

Command with County, then BRC shall not withhold its consent to a Separate Command.

(*Id.* at 5). As an initial matter, the Court must note that these provisions, in contrast to Section 5.1, appear to acknowledge that the Sherriff's Office has a responsibility to enforce state laws. Of course, under this illegal agreement, this responsibility is ostensibly limited to laws unrelated to child welfare.

The primary defect in the Integrated Command provisions, which require "input from BRC," is that they arguably endow BRC with the power to veto determinations of officer need. This is improper because, as explained above, the BLM permitting scheme requires the Sherriff's Office (and apparently only the Sherriff's Office) to provide law enforcement services. The BLM Permit simply does not allow for a "coordinated," "Integrated Command," wherein the Sherriff's Office, the BLM, and BRC, must agree on how to address law enforcement needs or specific instances of illegal conduct. Stated simply, the BLM permit mandates that the Sherriff's Office, and only the Sherriff's Office, make the law enforcement decisions described in the Integrated Command provisions. Any alternative agreement is unenforceable.

Section 6.1, which attempts to prohibit Judge Richard Wagner from hearing any proceedings related to the Settlement Agreement, is likewise illegal. The Court presumes that Judge Wagner is a duly elected state judge, with a right, and indeed an obligation, to hear the cases properly before him. However, Section 6.1 provides, in relevant part, "[i]n the event that any action concerning this agreement lacks subject matter jurisdiction in [the United States District Court for the District of Nevada] and must proceed in the Nevada state courts, the Parties agree that *Judge Richard Wagner shall be preempted* therefrom." (*Id.* at 8) (emphasis added). The Agreement further states, "the undersigned persons agree, in their official and individual

capacities, that they shall not file or prosecute any lawsuit, petition or other proceeding arising under or connected to this agreement . . . before Judge Wagner." (*Id.*).

To the extent that the Parties believe that they can contractually "preempt" Judge Wagner from hearing a case, they are quite mistaken. Indeed, Judge Wagner has due process rights in his authority to decide cases, and contracting parties cannot simply bargain those rights away.[7] If the Parties want to strip Judge Wagner of his jurisdiction to decide a particular case, they must go to another state court and move to displace him of his duties.

The Parties, of course, claim that Section 6.1 relates only to a local preemptory challenge rule that provides each litigant one chance to preempt one judge. However, no such rule is discussed in the agreement, which itself attempts to "preempt" Judge Wagner. Furthermore, suppose both parties exercise their respective preemptory challenges against other judges and their case ultimately falls before Judge Wagner. Could this or any other court enforce Section 6.1 and "preempt" Judge Wagner too? The answer is obviously no, because the provision is obviously illegal.

Finally, the County's attempt to bind itself to a fifty-year law enforcement services agreement in Section 3 is also illegal. At the Hearing, the Parties argued that Section 3, unlike the rest of the Settlement Agreement, is not intended to bind the County for fifty years, but is instead limited to a ten-year term. The Agreement itself, however, contains no such language. Indeed, nothing in the Agreement leads to the conclusion that Section 3 terminates in ten years, and in fact, the opposite is true: Section 2.1 provides that the fifty-year Agreement to Exempt Black Rock City from Other Provisions of Pershing County Code 5.16 (the "Exemption

---

[7] Here, the Court must note the irony of BRC's change in position: It initially came to this Court complaining that Judge Wagner had violated its due process rights through collusive judicial proceedings, and it now seeks to use similarly collusive proceedings (as explained below) to violate his.

Agreement") is fully incorporated and fully restated in the Settlement Agreement, which on its face includes Section 3's law enforcement services agreement. Because the Court must interpret the Agreement as drafted, without relying on contradictory post hoc allegations of intent, the Court must interpret the Agreement as an illegal attempt to bind the County to a services contract for a term of fifty years.

The Court recognizes the relationship between NRS 244.320 and A.B. 374. The former is the rule, and the latter is an exception. NRS 244.320 provides:

> A board of county commissioners may enter into any contract, lease, franchise, exchange of property or other transaction which extends beyond the terms of the county commissioners then in office and voting on the matter, but except as otherwise provided by law, the contract, lease, franchise, exchange or other transaction is binding beyond those terms of office only to the extent that money is appropriated therefor, or for a like item or service.

A.B. 374(5) provides an exception where, like here, a county enters into a festival ordinance exemption agreement: "Notwithstanding the provisions of NRS 244.320, any agreement entered into pursuant to this section may extend beyond the terms of the county commissioners in office and voting on the agreement regardless of whether the board appropriates money for the agreement beyond the terms of office."

However, as with the rest of A.B. 374, this subsection must be read to include at least some consideration of reasonableness. NRS 244.320 was obviously intended to prevent incumbent county boards from passing their debts to future boards. This same concern is implicated in any agreement, even one characterized as a festival ordinance exemption, in which a county board contracts to provide goods or services. Therefore, where, as here, an exemption agreement incorporates a contract for law enforcement services, A.B. 374(5) must be construed to impose some limit. Indeed, A.B. 374 cannot be read to allow one board to pass unreasonable financial burdens to successive future boards. Yet, this is exactly what the Parties propose. Specifically, they propose a fifty-year agreement in which the costs for law enforcement services

are set at a fixed rate (determined by Event attendance)[8] and adjusted for inflation using the Consumer Price Index (the "CPI"). (Settlement Agreement, ECF No. 97-1, at 7). This is absurd.

Over the next fifty years, law enforcement costs will undoubtedly rise significantly faster than the CPI. With each passing term, the United States Supreme Court and the Ninth Circuit Court of Appeals establish new precedent that rapidly increases the day-to-day costs of enforcing criminal laws. Likewise, advances in technology raise the standards for, and costs of, performing law enforcement services. To bind successive county boards to provide fifty years' worth of law enforcement services at today's rate is simply unreasonable, particularly in light of NRS 244.320. The Court cannot conclude that A.B. 374(5)'s narrow exception allows such agreements, because doing so would require the Court to adopt a position with no logical terminus. Indeed, were the Court to conclude that Section 3 is enforceable, it would have no basis for rejecting a similar 100-year agreement or an agreement that simply binds the county in perpetuity. The Court will not adopt such a position. Section 3 is illegal; it is unenforceable, and, like the other provisions above, it reflects poor legal advice.

### b.  Fraud and Abuse of Judicial Process

The Court also finds that BRC, in collusion with the County's counsel, filed and prosecuted this contrived, pretextual lawsuit in order to obtain its new and illegal Agreement with Pershing County, and in doing so, committed a fraud on this Court, Pershing County, and the Nevada Legislature.

---

[8] The County agreed to provide law enforcement services for the next fifty years at these rates:

| Peak Population | Base Payment (Separate Command) |
| --- | --- |
| 1 to 59,999 | $230,000 |
| 60,000 to 69,999 | $240,000 |
| 70,000 to 79,999 | $275,000 |
| 80,000 to 89,999 | $335,000 |
| 90,000 to 99,999 | $375,000 |

Specifically, the Court finds that BRC initiated this law suit, with then-viable and important constitutional claims, for the sole purpose of obtaining a favorable order on a motion to dismiss, which it intended to, and did, waive before the County and the Nevada Legislature, misrepresenting it as evidence that this Court condoned its claims and its intended agreement. Indeed, counsel for BRC relied on this Court's Order (ECF No. 60) in lobbying for the enactment of A.B. 374, using the Court's language on the facial defects in the County's then-existing Festival Ordinance (i.e., the previous version of PCC 5.16.180), to persuade the Nevada Legislature to create an exemption to NRS 244.320 and NRS 244.354, which it then used to negotiate for, and eventually obtain, its illegal fifty-year agreement with Pershing County. In doing so, BRC misrepresented the meaning of this Court's Order and, as explained above, the breadth of A.B. 374's exception to NRS 244.320 and NRS 244.354. Such conduct unquestionably constitutes an abuse of process. *Kovacs v. Acosta*, 787 P.2d 368, 369 (1990) ("An abuse of process claim consists of two elements: (1) an ulterior purpose other than resolving a legal dispute, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding."); *Dutt v. Kremp*, 894 P.2d 354, 360 (1995) ("An ulterior purpose includes any improper motive underlying the issuance of legal process." ) (internal citations and quotation marks omitted), *overruled on other grounds*, *LaMantia v. Redisi*, 38 P.3d 877 (2002).

Furthermore, since the issuance of the Court's order on the motions to dismiss, BRC has done very little, other than file various procedural motions, to advance this case; in fact, and as explained in great detail above, it even failed to respond to Defendant Shirley's motion for summary judgment. And yet, even after the County Board corrected PCC 5.16.180 to include constitutionally appropriate standards, County counsel advised the board to enter into the illegal Settlement Agreement. Indeed, the Court finds that County counsel mimicked BRC's charade, encouraging its client to settle on such obviously unfavorable and illegal terms and advising the Board that A.B. 374 permits such agreements. In doing so, it too relied on a misinterpretation of this Court's Order and applicable state law to convince its client that, despite the amendments to PCC 5.16.180, which resolved BRC's facial claims, and evidence sufficient to defeat the

Contract Clause claim, the County would be best served by entering into this one-sided, illegal Exemption and Settlement Agreement.[9]

The County Board was, of course, happy to accept counsel's erroneous advice. The Court finds that it did so in order to (1) hedge against the finical risks of defending against, and ultimately losing on, BRC's as-applied challenge; (2) allow Pershing County's relatively small economy to continue to benefit from the 50,000 plus visitors attending the annual Burning Man Event; and (3) to accomplish all of this while relying on this Court's orders, in this contrived lawsuit, to shield itself from an otherwise angry electorate. Indeed, if the County's counsel had its way, members of the County Board could respond to constituents disgruntled with the instant agreement by blaming its existence on one of this Court's Orders. The Court, of course, will not facilitate such political maneuvering by signing this preposterous agreement. Nor will it stand silent as the Parties waste precious judicial resources in the prosecution of this contrived case.

To be sure, the Court recognizes that it lacks jurisdiction to invalidate or void BRC's current contract with Pershing County; that jurisdiction lies within the appropriate state court hereafter. However, based on the filings in this case, the Court does have jurisdiction to declare an abuse of process and the commission of fraud upon the Court in the filing and prosecution of this federal action. It likewise has jurisdiction to declare the fraud visited upon the County Defendant and the Nevada Legislature in obtaining this illegal and invalid contract.

The Court also has jurisdiction to deny approval of the Settlement Agreement, and the attached and incorporated agreements, due to the fact that the contract is illegal on its face. The

---

[9] Here, it must be noted that the parties entered into an identical version of the Exemption Agreement on July 3, 2013, (*See* Exemption Agreement, ECF No. 80-1, at 2–8), prior to the filing of Defendant Shirley's motion for summary judgment and more than four months before filing the instant Settlement Agreement, which purports to incorporate it. While the Court did not discuss the implications of the July 3, 2013 Exemption Agreement (because it too is invalid) in its analysis of BRC's lack of standing to prosecute the as-applied challenge, it is clear that the Parties believed that the as-applied challenge was resolved, and therefore that BRC lacked standing to maintain it, as early as July 3, 2013. By implication, then, the Parties were aware that BRC's as-applied claim, like its other surviving claims, would not survive a motion for summary judgment. This not only supports the Court's decision to grant Defendant Shirley's July 31, 2013 motion for summary judgment, it raises serious questions regarding the County's decision to settle—particularly on such unfavorable terms.

Parties, in their first stipulated settlement proposal (ECF No. 97), asked the Court to approve the Settlement Agreement and to retain exclusive jurisdiction to interpret and enforce it for the next ten years. Again, the Court denies that request due to the illegality and invalidity of the agreement.

## CONCLUSION

IT IS HEREBY ORDERED that Plaintiff's Motion to Dismiss (ECF No. 95) is DENIED

IT IS FURTHER ORDERED that Defendant Jim Shirley's Motion for Summary Judgment is GRANTED in the entirety.

IT IS FURTHER ORDERED that the case is CLOSED and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

Dated:  January 6, 2014

_____
ROBERT C. JONES
United States District Judge