TERRY GROSS (*pro hac vice*)
ADAM BELSKY (*pro hac vice*)
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, California 94104
T: (415) 544-0200 / Fax: (415) 544-0201
Email: terry@gba-law.com

KAREN G. JOHNSON-MCKEWAN (*pro hac vice*)
ANNETTE L. HURST (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
T: (415) 773-5700 / Fax: (415) 773-5759
Email: ahurst@orrick.com

ROBERT P. REZNICK (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
T: (202) 339-8400 / Fax: (202) 339-8500
Email: rreznick@orrick.com

RICHARD L. ELMORE, NSB #1405
TAMARA REID, NSB #9840
HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, NV 89511
T: (775) 327-3000 / Fax: (775) 786-6179
Email: treid@hollandhart.com

*Attorneys for Plaintiff Black Rock City, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| BLACK ROCK CITY LLC<br><br>          Plaintiff,<br><br>v.<br><br>PERSHING COUNTY BOARD OF COMMISSIONERS, et al.,<br><br>          Defendants. | **CASE NO. 3:12-cv-00435-RCJ-(VPC)**<br><br>**DECLARATION OF RAYMOND ALLEN IN SUPPORT OF PLAINTIFF BLACK ROCK CITY, LLC'S RULE 59 AND RULE 60 MOTIONS** |

I, Raymond Allen, declare as follows:

1. I hold a J.D. degree from UC Davis, King Hall School of Law, granted in 2002, and a B.A. degree in Anthropology granted in 1994, Phi Beta Kappa, from the University of Florida. I am an attorney admitted to practice law in the state of California. I am currently the Government Affairs Manager for Black Rock City LLC ("BRC"), and I have held that position for ten years, since January 2004.

2. BRC is the entity that sponsors the Burning Man Event ("Burning Man" or "Event"). As BRC's Government Affairs Manager, I am the person primarily responsible for managing our relationships with all public entities regarding the Event, including the United States Department of Interior, Bureau of Land Management, Pershing and Washoe Counties in Nevada, the State of Nevada, Nevada Highway Patrol, Nevada Department of Transportation, Nevada Off-Highway Vehicle Commission, Nevada Department of Public Safety, and native tribes including the Pyramid Lake Paiute Tribal Reservation, Summit Lake Paiute Tribal Reservation. I am responsible for understanding the legal framework governing the Event, and working with our staff, contractors and outside attorneys to ensure compliance with all applicable laws and regulations.

3. I make this declaration of my own personal knowledge, or based on information contained in the books and records of BRC over which I have supervision, or based on the contents of other documents attached hereto, as indicated herein. Everything stated herein is true and correct based upon my personal knowledge or based upon BRC institutional knowledge subject to my supervision.

4. Each year since 1990 (with the exception of 1997), BRC (or its predecessors) has held the Burning Man Event in the area commonly called the Black Rock Desert, a site on public land formally known as the Black Rock Conservation Area and managed by the United States Department of Interior Bureau of Land Management. The Black Rock Desert is located partially within Pershing County, Nevada.

5. BRC also organizes and promotes other artistic and performance events throughout the year; provides funds and support to nonprofit organizations that work with local

- 2 -

1  communities to place large-scale art in public spaces in those communities; provides funds and
2  support to a nonprofit dedicated to installing solar and renewable energy systems in the non-
3  profit, public, low-income and educational sectors; and provides funds and support to art events
4  and communities throughout the world, in substantial part based on revenues generated by the
5  Event.

6       6.      As the Burning Man website explains, over 50,000 people attend the Event each
7  year "to be part of an experimental community, which challenges its members to express
8  themselves and rely on themselves to a degree that is not normally encountered in one's day-to-
9  day life." See http://www.burningman.com/whatisburningman/. The Burning Man website
10 continues: "Art is an unavoidable part of this experience, and in fact, is such a part of the
11 experience that Larry Harvey, founder of the Burning Man project, gives a theme to each year,
12 to encourage a common bond to help tie each individual's contribution together in a meaningful
13 way. Participants are encouraged to find a way to help make the theme come alive, whether it
14 is through a large-scale art installation, a theme camp, gifts brought to be given to other
15 individuals, costumes, or any other medium that one comes up with." Id. In short, one of the
16 Event's primary purposes is to encourage communication and individual expression through art
17 and other media, all directed towards exploring a common theme.

18       7.      The Burning Man Event is quite different from a music concert or other
19 commercial event in which attendees are invited to watch performances. To quote BLM, it is
20 "a combination art festival, social event, and experiment in community living." Burning Man
21 2006-2010 Special Recreation Permit NV-020-06-EA-11, Environmental Assessment, available
22 at: http://www.blm.gov/pgdata/etc/medialib/blm/nv/field_offices/winnemucca_
23 field_office/nepa/recreation/0.Par.72197.File.dat/Burning%20Man%20EA%202006.pdf. It is
24 the gathering and creation of a large community, most of whose members contribute and
25 participate in the artistic structures or events that occur at Burning Man. BRC does not provide
26 any entertainment for participants, but rather through maintenance of the Event and the
27 provision of guidance and funding to support artistic and other aspects of the Event enables the
28

1    participants and members of the community that provide any "entertainment" or community
2    interaction.

3         8.    At the annual Burning Man Event, in the Nevada desert, BRC designs and
4    maintains a temporary "city" (referred to each year as "Black Rock City") (the "City"). During
5    the Event, hundreds of art installations and civic spaces are built in the City by participants, and
6    literally thousands of small events or gatherings are conducted in which participants share
7    creative ideas. There are more than 800 "theme camps" funded and built solely by participants
8    with support from BRC, which are large artistic installations or spaces combined with a
9    participatory element, and in each theme camp the group presents a performance, event or space
10   which induces attendees to participate. Participants publish several daily newspapers, broadcast
11   several radio stations, take photographs and create "yearbooks" to give away. Many attendees
12   engage in artistic expression by dressing in costume and participating in many of the events and
13   performances.

14        9.    Virtually all of the myriad art installations, spaces open to participants, stages
15   and music and performance venues are designed, created, funded and operated by participants,
16   with an infrastructure and guidance provided by BRC. Thus, BRC builds a statue of a human
17   figure and provides one central gathering area (the Center Camp Café); BRC provides the
18   City's infrastructure, laying out the perimeter of the Event and the City streets; it assists in
19   placement of participants' camps; and provides security, portapotties, medical facilities, and
20   similar types of infrastructure services; provides support in the form of heavy equipment,
21   expertise, and expertise in building; and provides grants to artists and participants who are
22   bringing large scale art installations to the City.

23        10.   Thus, the intention of BRC is to bring together a community of individuals of
24   similar artistic and spiritual ideas, and to create an environment in which individuals are
25   encouraged and enabled to express artistic interests and join other artists in the creation of their
26   vision. The ethos of the Burning Man Event is embodied in Ten Principles: radical inclusion,
27   gifting, decommodification, radical self-reliance, radical self-expression, communal effort, civic
28   responsibility, leaving no trace, participation, and immediacy.

- 4 -

11.     Further, the Burning Man Event operates on a "gift economy," and this decision to avoid commerce at the Event has created a generous outpouring from participants. Unlike at other concerts or festivals, nothing is permitted to be sold or bartered at the Burning Man Events (the only exception is for ice and coffee, which are sold by volunteers, with profits from ice sales donated to local charities). There is no food vending, no vending of drinks, no vending of merchandise or supplies. In place of commercial vending or barter, members of the community bring items, performances and services, and freely gift these to any participant. Groups of participants gather together during the year to build community artistic spaces which they bring to the Black Rock Desert, and freely invite participants to share in them, which include art installations, camps in which music, performances, food, drink, clothing, and other items and services are freely gifted, others which provide materials so that participants create their own artworks and costumes, or camps where services such as medical and healing services, bicycle repair, counseling, discussions are provided, all free of charge. For example, there are more than 100 camps which provide stages and sound systems for performances, music, speeches and discussions. The world-renowned TED conferences regularly holds a conference at Burning Man, in which thousands of people come to discuss many important issues about community, the environment and the world.

12.     Another principle of the Burning Man Event is to be free from commodification. This means that no advertising of any sort is permitted at any Event. While at music festivals or sporting events, one often sees many banners bearing the names and logos of commercial companies, and a lot of "branded" materials are distributed by various companies, there is virtually no such activity that takes place at the Burning Man Events. In furtherance of this principle, BRC also refuses to license the Burning Man trademark to be used in advertisements or to permit sponsors or advertising at the Event, or throughout the year. BRC volunteers continuously review any attempts by commercial companies to utilize Burning Man trademarks and imagery from the Burning Man Events and report these to BRC, and BRC has an active group that prevents any such use of Burning Man trademarks. Because of this core principle of

1   the Burning Man community, BRC does not receive any income from advertising or licensing

2   of its well-known trademarks, and regularly rejects offers to license its trademarks.

3         13.     Because a very important goal of BRC is to create a temporary community in

4   which all who wish to can participate, BRC has tried very hard not to allow the cost of a ticket

5   to the Event to escalate beyond the means of those who earn a modest income.  Especially

6   because individuals who pursue artistic endeavors as a career often are limited in their financial

7   means, it is critical that the ticket cost of the Event to individual participants not become so

8   exorbitant that this basic purpose of the community is destroyed.

9         14.     Except for 2007, when it took place on private land, the Event has taken place on

10  federal land administered by the Bureau of Land Management ("BLM"), an agency of the U.S.

11  Department of the Interior, and since 1992 pursuant to a permit issued by the BLM (each year's

12  "BLM Permit").  The BLM Permits, issued under authority of and pursuant to standards set by

13  federal law, specify BRC's rights and obligations for a wide variety of activities, including

14  public safety issues including, among others, security, fire protection, and emergency services,

15  consumption of liquor, and protection of minors.

16        15.     For example, the 2012 BLM Permit provides that BRC "shall be authorized to

17  conduct the Burning Man event on public lands in Pershing County, Nevada for a one-year

18  period (2012)," on the "southern portion of the Black Rock Desert [in the] High Rock Canyon

19  Emigrant Trails National Conservation Area."  A true and correct copy of the 2012 BLM

20  Permit and Stipulations thereto is attached hereto as Exhibit A.  The 2012 BLM Permit also

21  specifically addresses, and affirmatively specifies standards and provisions for, aspects of the

22  conduct of the Festival, including sanitation, emergency medical facilities and services, fire

23  protection, security, participant camping, traffic, access and parking control, illumination, water

24  supply and food supply, communication services, consumption of liquor and unlawful drugs,

25  and safety for the Event.

26        16.     Incorporated by reference into the BLM Permit is the "Burning Man Operating

27  Plan" (the "Operating Plan"), which supplements the specific provisions of the BLM Permit

28  and governs virtually every aspect of the conduct of the Event.  A true and correct copy of an

1  example Operating Plan in attached hereto as Exhibit B.  The Operating Plan provides a

2  comprehensive blueprint for the management of the Burning Man event and the protection of

3  the participants' health and safety.  Among many other provisions, it specifically has provisions

4  addressing "Protection of Minors" and "Illegal Alcohol & Substance Policy" *Id.*, Sections

5  IV.C.6 and .7, respectively).

6        17.    Pursuant to relevant federal regulations the current BLM Permit requires BRC to

7  reach agreement with the Pershing County Sheriff's Office and a number of state and local

8  government agencies concerning the provision of local services by these agencies, stating that

9  "BRC shall complete formal agreements with all affected parties, *e.g.*, Pershing County

10  Sheriff's Department, Washoe County Sheriff's Department, Nevada Department of Public

11  Safety-Investigations Division, Nevada Highway Patrol, and Nevada Department of Health and

12  Human Safety for the purpose of addressing concerns and impacts associated with social

13  services *e.g.* law enforcement and emergency medical services and physical infrastructure *e.g.*

14  transportation systems and human waste disposal."

15        18.    From 1995 until 2005, as part of the BLM permit, the fee paid by BRC to BLM

16  was a flat fee based on attendance, and this fee covered all governmental services on BLM land,

17  including services provided by state and local governmental entities or agencies.  Thus, from

18  1995 to 2005 BLM contracted with the Pershing County Sheriff's Office, and BLM paid this

19  agency for its services.  BRC paid one flat fee to BLM during that period.

20        19.    In 2006, BLM imposed a different scheme, moving to a cost recovery system in

21  which BRC would pay for BLM's actual costs, which meant that BRC would be responsible to

22  pay for the reasonable, justified and documented costs for services provided by other agencies

23  according to established BLM cost recovery guidelines.  BLM further directed, instead of BLM

24  contracting with local government agencies and then requesting reimbursement from BRC, that

25  BRC contract directly with state and local government agencies for the provision of local

26  services, including contracting with the Sheriff's Office for law enforcement services.

27        20.    Meanwhile, in 2004, Pershing County amended Pershing County Code Chapter

28  5.16, the Pershing County Festival Ordinance ("Festival Ordinance" or "Ordinance"), to require

that a fee be paid to the County for any event occurring in the County where more than 1,000 people attend. To BRC's knowledge, the only event of that size that had occurred in Pershing County in modern times (indeed, probably ever) was the Burning Man Event, and it seemed clear to us from public statements made at the time that the Festival Ordinance was targeted at the Event.

21.     BRC protested the application of the Festival Ordinance to the Event. At a County Commission meeting I objected to the application of the Ordinance to the Event and indicated that BRC was prepared to file a lawsuit if necessary.

22.     The location of the Event in the Black Rock Desert National Conservation Area also includes portions of other counties in Nevada, who have never sought to regulate the Event under their festival ordinances. Rather, for example, the Washoe and Storey County festival ordinances expressly exempt from their scope any events taking place on federal land. Washoe County, Nev., Code §§ 25.263-25.305; *id.* at § 25.269 (stating "A person must secure a license . . . to conduct or operate any outdoor event . . . to take place on public or private lands in the unincorporated area of Washoe County, except for . . . federal lands."); Storey County Codes, Ch. 8.28; *id.* at § 8.28.020 (stating "[N]o person shall conduct . . . a parade, special event or filming activity in, on or upon any county street, sidewalk, alley, park, way, public place or public property which is owned or controlled by the county, or private property without first having obtained a written permit from the county manager or his designee.").

23.     After BRC sent its demand letter, the County and BRC negotiated regarding BRC's threatened litigation and reached a compromise. The compromise was reflected in that certain "Agreement and Settlement" between the Parties executed November 14, 2005 (the "2005 Settlement Agreement"). The 2005 Settlement Agreement exempted the Burning Man Event from the application of Section 5.16 of the Festival Ordinance. A true and correct copy of the 2005 Settlement Agreement is attached hereto as Exhibit C.

24.     In the 2005 Settlement Agreement, the County agreed to amend its Festival Ordinance to exempt the Burning Man Event from the application of the ordinance in light of the comprehensive BLM permitting scheme that required BRC to compensate the county for

- 8 -

1    public health and safety costs via a contract. BRC agreed to make an annual payment of

2    $40,000, of which $30,000 was to be paid directly to the County, and another $10,000 was to be

3    donated directly to non-profit organizations operating within the County. The amount to be

4    paid each year would increase if the number of participants increased. BRC and the County

5    also agreed that this payment to the County would be to cover any additional expenses that the

6    County may incur as a result of the Burning Man Event being held in the County, even though

7    the County had not identified such additional expenses. During the negotiation of this 2005

8    Agreement, County representatives told me that $30,000 a year would be more than enough to

9    compensate the County for any direct or indirect expenses (other than law enforcement) related

10   to the Event.

11        25.    Operating under the 2005 Settlement Agreement, BRC continued to hold the

12   Burning Man Event in the Black Rock Desert. BRC made numerous charitable contributions

13   pursuant to the 2005 Agreement and otherwise. BRC donated to the local library, the hospital,

14   developed a local solar power project for a school, and in general behaved as an upstanding and

15   supportive member of the Pershing County community. The donations were well beyond what

16   was required by the 2005 Agreement. In addition BRC gives free advertising to Pershing

17   County businesses on the Burning Man website and email lists to promote the purchase of

18   goods and services by Burning Man participants in Pershing County. BRC also worked with its

19   affiliate Black Rock Solar to donate solar arrays to government buildings in Pershing County,

20   including the Pershing County General Hospital and Pershing County schools. The solar arrays

21   have saved the County significant utility costs.

22        26.    Throughout this period beginning in 2006, BRC also entered into a series of

23   separate law enforcement services agreements with the County. As noted above, these

24   agreements were required by the terms of the BLM Stipulations which are part of the federal

25   permit for the Event. Each of these law enforcement agreements was duly approved and

26   adopted by the Pershing County Commission. Attached hereto as Exhibits D-I are true and

27   correct copies of Law Enforcement Agreements for the years 2006-2011. The Law

28   Enforcement Agreement signed in 2007, was a multi-year agreement for 2007-2009;

- 9 -

accordingly, Exhibits F and G are 2008 and 2009 addenda to the 2007 Law Enforcement Agreement.

27.     Pursuant to these separate law enforcement agreements with Pershing County beginning in 2006, BRC paid the following sums each year for five years after the 2005 Settlement:

2006:  $66,000;

2007:  $110,000;

2008:  $121,000, plus $27,500 for a prosecution payment;

2009:  $142,000 for law enforcement and $14,000 for prosecution costs;

2010:  $145,000 for law enforcement, $7,000 for vehicle usage, and $14,000 for prosecution costs;

2011:  $154,000 for law enforcement, $7,000 for vehicle usage and $14,000 for prosecution costs.

28.     In some years, the County Sheriff issued an "After-Action Report," describing the law enforcement services rendered by the Count at the Event. Attached hereto as Exhibits J-P are true and correct copies of After Action Reports for the years 2005-2012 (except 2010, for which year the Pershing County Sheriff's Office did not issue a Report). From these reports and other publicly available services, we learned that the number of arrests by Sheriff's personnel at the Event each year from 2006 through 2012 was as follows: in 2006, 1 arrest; in 2007, 8 arrests; in 2008, 11 arrests; in 2009, 22 arrests; in 2010, 9 arrests; in 2011, 8 arrests; in 2012, 12 arrests.

29.     In the fall of 2010, County Commissioner Daren Bloyed informed me that there was a local judge who was opposed to the Burning Man Event. He explained to me that this local judge was a deeply conservative member of the Mormon faith who did not think that Burning Man should be in Pershing County. In the same conversation, Commissioner Bloyed then informed me that some of the County Commissioners wanted BRC to further increase its annual donation to the County, over and above the increased amounts that had already been paid during the intervening years as a result of population increases.

30.     On December 22, 2010, BRC agreed that for 2011 it would pay $55,500, with

1    $43,500 going to the County and $12,000 donated directly to non-profit organizations within
2    the County.

3        31.     On January 6, 2011, I emailed Jim Shirley, Pershing County District Attorney,
4    and informed him that BRC needed a revised agreement before BRC would be able to pay the
5    total amount of $62,000 that had been discussed (of which $50,000 would be paid directly to
6    the County), since the terms were different that the previous agreement. In my email, I attached
7    a proposed settlement agreement containing the terms that Commissioner Bloyed had insisted
8    upon in our late 2010 conversations. Attached hereto as Exhibit Q is a true and correct copy of
9    my email with attachment. Mr. Shirley responded by email the same day and said he would
10    "review and get back with signatures." Attached hereto as Exhibit R is a true and correct copy
11    of Mr. Shirley's response.

12        32.     On January 25, 2011 I received a letter and a hardcopy of a revised agreement
13    with Pershing County Commissioner Darin Bloyed's signature on it from Karen Wesner,
14    Administrative Assistant for Pershing County. A true and correct copy of that letter and
15    agreement is attached hereto as Exhibit S.

16        33.     On January 27, 2011 I executed the agreement and mailed a hardcopy back to
17    Karen Wesner (the "January 2011 Agreement"). Having sent the agreement to the D.A.,
18    received his acknowledgement of review and that signatures would be sent, having received a
19    signed, *modified*, agreement from the County Administrator, and after returning it with my
20    signature indicating BRC's assent, it was my understanding that we had a new agreement. I
21    believed that the County had followed whatever procedures were necessary for it to authorize,
22    sign and attest to the agreement. BRC therefore proceeded to perform under the terms of the
23    new, 2011 Agreement.

24        34.     On February 15, 2011, BRC paid an additional $6,500 for the total $50,000
25    payment to Pershing County. Pershing County accepted and deposited the check.

26        35.     On March 24, 2011, in order to demonstrate BRC's complete performance under
27    the 2011 Agreement, I mailed a letter to Pershing County Commissioner Bloyed that outlined
28    all of the charitable donations BRC made in the County that year, including the increased

1    $50,000 donation to the County. A true and correct copy of that letter is attached hereto as

2    Exhibit T.

3         36.    In the summer of 2011, Pershing County Commissioner Pat Irwin requested that

4    BRC provide access and a tour of the Burning Man Event for a group of local senior citizens in

5    Pershing County in order for the citizens to better understand what the Burning Man Event is

6    about. In August 2011, I coordinated with my staff and BRC provided entry and a tour of the

7    2011 Burning Man Event for the Pershing County senior citizens.

8         37.    In 2011, the Pershing County Sheriff's Office After-Action Report revealed the

9    following number of infractions for the eight-day Event, which had a peak population of 53,963

10   participants: one arrest for battery, three arrests for domestic battery, two arrests for possession

11   of controlled substances, two citations for battery, and seven trespass advisements. In addition,

12   there were six reports relating to missing/found children—all had been safely reunited with

13   their parent or guardian within a matter of minutes. No serious criminal violations were

14   reported.

15        38.    The 2011 report also stated that the Sheriff's Office staffed the 2011 Burning

16   Man Event with 22 deputy sheriffs who worked in three staggered shifts. The Sheriff reported

17   that "[t]here were sufficient personnel most of the time to handle the incidents as they

18   occurred," and stated that the Sheriff wanted an additional four officers and two investigators

19   staffed on the Thursday, Friday, and Saturday nights of the Burning Man Event. Based on the

20   performance and results in 2011, we expected at most modest increases in law enforcement

21   expenses in 2012 to cover the additional shifts on those three nights.

22        39.    In October 2011, Commissioner Irwin called me and said that he had a long

23   conversation with a local judge, Judge Richard Wagner. He said that Judge Wagner had said to

24   him that the Burning Man event was immoral, and that the Burning Man event shouldn't be

25   allowed in the County. He said that Judge Wagner had also stated that in his opinion Burning

26   Man access being given to senior citizens was Burning Man buying off the County, that senior

27   citizens should not be attending this event and that Commissioner Irwin should not be

28   requesting tours. Commissioner Irwin reported that Judge Wagner said he believed the event

- 12 -

1  was not appropriate for senior citizens because they might see activity such as nudity at the

2  event. Commissioner Irwin also reported that Judge Wagner had stated that he was opposed to

3  any of the Agreements between Pershing County and BRC that provided that the County would

4  not apply the County's Festival Ordinance to BRC. Judge Wagner had said to the

5  Commissioner that he viewed these agreements as another instance of BRC buying off the

6  County, and Judge Wagner believed the County should instead apply its Festival Ordinance to

7  the Burning Man event (despite having a binding settlement agreement that stated otherwise) so

8  that Pershing County could control and limit activities that occurred at the Burning Man event.

9       40.    This was now the second conversation in which a County Commissioner had

10  informed me that Judge Wagner objected to nudity, the presence of minors or senior citizens, as

11  well as the Event as a whole. I understood at this point that Judge Wagner wanted the County

12  to use the Festival Ordinance as a way to try to control the content of the Event, or to drive it

13  away altogether through ever-increasing financial demands. I was very concerned about the

14  fact that increased financial demands began occurring at the same time as these

15  communications from Judge Wagner. I viewed this as a kind of pretextual strategy to drive the

16  Event out of the County because of disagreement with the perceived content of the Event.

17       41.    On October 26, 2011, I attended the 2011 Post-Event Burning Man Cooperators

18  Meeting in Reno, Nevada, hosted by the Bureau of Land Management. The meeting had

19  representatives from all of the government agencies that cooperate to produce the Burning Man

20  event. Commissioner Pat Irwin was present. After the meeting he informed me that something

21  had happened in Pershing County recently that I should know about. He reiterated what he had

22  told me previously, that Judge Wagner stated that in his opinion the November 2005 Agreement

23  was Burning Man buying off the County and that he wanted the Commissioners to revoke that

24  Agreement and apply the Festival Ordinance to the Burning Man event.

25       42.    Commissioner Irwin then said that Judge Wagner had learned that

26  Commissioners Bloyed and Irwin had taken a tour of the 2011 Burning Man event and had

27  received free entrance to the Burning Man event to do so, and that on this basis the judge was

28  now threatening to initiate ethical investigations against the Commissioners. There seemed to

1  be an intimation by Judge Wagner that the Commissioners could avoid these ethical

2  investigations if they revoked the Settlement Agreement and switched to regulating the Burning

3  Man event under the County's Festival Ordinance.

4       43.    BRC has always provided tours of the Burning Man Event for state, local, tribal

5  and federal government officials, and many public officials have taken advantage of such tours.

6  As a professional working in government affairs, this is a commonplace event—the same way

7  United States Senators on the Foreign Affairs Committee might choose to visit a country where

8  they are considering the terms of a treaty. BRC provides government officials with a credential

9  that is worth no monetary value in order to enter the event site.

10       44.    Commissioner Irwin then informed me that there was already a bill with

11  revisions to the Festival Ordinance being presented to the Commission.

12       45.    Between October 26, 2011 and October 31, 2011 I called District Attorney Jim

13  Shirley and requested a copy of the proposed amendment to the Festival Ordinance. Mr.

14  Shirley told me that there was an ethics investigation pending for Commissioners receiving

15  Burning Man access because Judge Wagner felt that Burning Man was paying off the County.

16  He said that the Festival Ordinance was the way to avoid this problem. Mr. Shirley said that the

17  proposed bill would make the Burning Man event *for adults only*, and that neither he nor Judge

18  Wagner thought children should be allowed at the event because they might encounter nudity.

19       46.    In early November 2011, I spoke to Commissioner Bloyed on the phone. I heard

20  the same thing from him that I had been told by the others. He told me that Judge Wagner

21  believed that Burning Man was immoral and that what happened there shouldn't be allowed in

22  Pershing County, that Burning Man was not a place for children, and that Judge Wagner had

23  threatened him with an ethics complaint and a grand jury investigation if Commissioner Bloyed

24  didn't take action to regulate the Burning Man event. Commissioner Bloyed said he used to be

25  okay with children at the event, but that he had a change of heart after "talking" with Judge

26  Wagner.

27       47.    In early November I also learned, by reading a public report of the agenda of the

28  Pershing County Commission meeting held on October 19, 2011, that the Commissioners had

- 14 -

1   already conducted a first reading of the proposed amendments to the Festival Ordinance. BRC

2   had not been given any notice, despite the fact that the legislation was obviously targeted at the

3   Burning Man Event.

4        48.    On November 16, 2011, I attended the meeting of the Board of the Pershing

5   County Commissioners, in which there was a second reading of the proposed amendment to the

6   County's Festival Ordinance. At that point I finally received a written copy of the proposed

7   legislation. A true and correct copy of this Draft Bill of Pershing County Festival Code,

8   5.16.060, Oct. 19, 2012 is attached hereto as Exhibit U. The proposed amendment would have

9   banned anyone under 18 at an event "where nudity is likely to occur, even if for artistic

10  purposes." Ex. U at p. 10. The amendment obviously was targeted at Burning Man, as there

11  has never been any assembly in Pershing County other than the Burning Man event that fits the

12  definition of an assembly that would be required to apply for a license under the Festival

13  Ordinance.

14       49.    At that November 16 meeting, Judge Wagner spoke publicly, stating as follows

15  about BRC and the Burning Man event: "they're selling titillation to the public. That's the

16  product they sell." Pershing County makes an official audio recording at such meetings. At my

17  direction, and under my supervision, BRC staff transcribed the official recording of the

18  November 16, 2011 meeting. The transcript of this meeting accurately reflects the events of the

19  portions of the meeting I attended, and I have confirmed the accuracy of the remainder of the

20  transcript. A true and correct copy of the Transcript of November 16, 2011 meeting is attached

21  hereto as Exhibit V. Personally, I found it somewhat ironic that a public official in the State of

22  Nevada, the only state in the nation where both gambling and prostitution are legal, was

23  complaining about expressive nudity at an art festival as "selling titillation."

24       50.    As reflected in the Transcript, Judge Wagner also made the following additional

25  statements:

26          a.  "I'm very concerned about what the community standards are becoming in
       this community. When they first came, everyone was shocked. Now, we've
27              accepted them and now we're embracing them, because what? They bring
       money to the community? Something's wrong with that."
28

- 15 -

b. "This isn't a place for young people under eighteen to be, under any circumstances. That's my opinion."

c. "You want to see what a lawless culture, built like 49ers and Deadheads and Cyber Punks leads to? National Magazine, I would say it in two words, 'Penn State.'" [1]

d. "The laws of the state and the laws of this county apply to Burning Man as much as they do to the city limits of Lovelock, and what's described in this article, if people were to do it here, they would be in jail, in prison."

e. "[T]he idea that they can self-regulate and have their own policemen and carry out their own regulations is ludicrous. It is people here, county officials, who have absolute duty to enforce the laws. You took an oath, as did law enforcement, to uphold the laws and constitutions of the state. That includes lewdness around children and the other things that have occurred."

51.     At that November 16 meeting, BRC's counsel reminded the Commissioners that the County signed the November 2005 Settlement Agreement and the January 2011 Settlement Agreement, in which the County agreed that it would not apply its Festival Ordinance to the Burning Man Event. At that point Judge Wagner stated that he believed the agreements were invalid because they were a contract that would bind a county beyond the term of office of the Commissioners and a state statute prevented such contracts. Judge Wagner's statement was the first time we ever heard from anyone that there was any purported problem with the settlement agreements being enforceable, since neither the District Attorney nor any Commissioners had ever mentioned this issue. We did not understand how a county could ever compromise litigation if that were the case, since by definition the releases and other agreements accompanying the resolution of such disputes last longer than one or two years. The general releases granted in settlement agreements are, by definition, made in perpetuity in order to waive all claims, whether known or unknown, regarding past events. By definition any such agreement has effects that extend beyond the term.

52.     After the agenda item was over and BRC's representatives left the meeting (including myself), District Attorney Jim Shirley stated that he wanted the Commissioners to

---

[1] This appears to have been a reference to the pedophile Jerry Sandusky, and was intended to equate Burning Man with the abhorrent and harmful conduct in which he engaged in molesting young athletes under his care. There has never been any hint, suspicion, or investigation, let alone any charge, of such activity occurring at Burning Man. This is deeply offensive to the BRC staff who collaborate with the various law enforcement agencies to create a safe and lawful environment at the event.

- 16 -

1   regulate the Burning Man Event to prevent children from seeing art at the event unless everyone

2   at Burning Man (all 58,000 participants) agreed to be completely clothed at all times.  Since I

3   was no longer at the meeting, I learned this only later when I reviewed the transcript.

4       53.   Then, at a November 30, 2011 Special Commissioner's Meeting, Mr. Shirley

5   claimed that he only had a copy of the November 2005 Agreement, and that he did not have a

6   copy of the January 2011 Agreement.  At the same Special Meeting, Commissioners Irwin and

7   Shank stated that state laws should be enforced to prohibit the attendance of minors at the

8   Event.  At my direction, and under my supervision, BRC staff transcribed the official recording

9   of the November 30, 2011 meeting.  The transcript of this meeting accurately reflects the events

10  of the portions of the meeting I attended, and I have confirmed the accuracy of the remainder of

11  the transcript.  A true and correct copy of the November 30, 2011 Transcript is attached hereto

12  as Exhibit W.

13      54.   On Friday, December 16, 2011 I emailed to Mr. Shirley a copy of the executed

14  January 2011 Agreement that I had previously sent to the County.  A true and correct copy of

15  that email is attached hereto as Exhibit X.

16      55.   On December 20, 2011, Commissioner Bloyed called me, and said that Judge

17  Wagner was moving forward with a grand jury investigation against him.  Bloyed said he was

18  thinking of not running for reelection because of the Judge's threats. A few days later, I spoke

19  to Commissioner Bloyed again.  Bloyed acknowledged that he signed the January 2011

20  Agreement in January 2011.  He said that he believed Judge Wagner was moving forward with

21  an ethics investigation in hopes that Bloyed would resign as a Commissioner so that the County

22  could then claim that the Agreements between the County and BRC that Bloyed signed could

23  be avoided.  Commissioner Bloyed also said that Judge Wagner, by threatening to file an ethics

24  charge against him, might be trying to force him to void the Agreement between the County and

25  BRC and take legislative action that would drive Burning Man out of the County.

26  Commissioner Bloyed said he believed that Judge Wagner may also be doing the ethics

27  investigation because the Commissioners did not agree to purchase a parcel of real estate that

28  the Judge's wife offered to sell the County for $300,000.

56. On January 8, 2012 I spoke to DA Jim Shirley, and he told me that Judge Wagner had been making statements to the effect that BRC is buying off the County by entering into agreements with the County to pay money to the County for law enforcement and to have the Festival Ordinance not apply to the Burning Man Event—despite the fact that the BLM permit (which was governed by federal regulations) required BRC to enter into such an agreement with the county.  Shirley told me that Judge Wagner had convinced at least Commissioner Shank that the Commissioners should impose much more law enforcement at Burning Man in order to police activity at the event that the judge found offensive.

57. On February 2, 2012, the Commission enacted a revised amendment to the Festival Ordinance.  A true and correct copy of the revised amendment to the Festival Ordinance is attached hereto as Exhibit Y.  The amendment as enacted increased the permit fee for outdoor assemblies to $1.50 per person per day.

58. On June 12, 2012, a BLM Permit was issued for the 2012 Burning Man Festival, attached hereto as Exhibit A.  The 2012 BLM Permit required BRC, as before, to enter into a law enforcement agreement with the County.

59. Discussions between BRC and the County over a law enforcement agreement to cover the 2012 Burning Man Event had commenced long before, in January 2012.  Around March 15, 2012, a representative of the Sheriff's Office stated that six additional deputies would be required for the 2012 Burning Man Event, increasing the total Sheriff's Office budget to $180,000. A few days later, around March 20, 2012, BRC was informed by the County that the Sheriff's Office budget had been increased to $282,000, as several Commissioners had requested doubling of law enforcement from that at the 2011 Event in order to provide more "protection" to any children present.

60. After another month went by, and Sheriff Machado and DA Shirley provided a revised budget to BRC, by which time the Sheriff's Office budget had more than doubled to $428,384, plus an additional $25,000 for judicial administration, $5,000 for County Recorder/Secretary services, and a $20,000 "contingency fee."

1      61.    On May 1, 2012, the County submitted to BRC a proposed law enforcement

2   agreement, with a budget reduced to $346,700 plus the additional $50,000 in fees. The revised

3   budget included a provision stating that the proposed agreement "does hereby rescind, revoke,

4   and supersede any and all prior agreements." Representatives of the County stated to BRC

5   representatives that this provision was intended to revoke the 2005 Agreement. By this time the

6   County had taken the position that the 2011 Agreement had never been signed by the County

7   and was therefore not valid.

8      62.    At a May 2, 2012 Commission meeting, and at a May 14, 2012 negotiating

9   session for a law enforcement agreement between BRC and the County, BRC representatives

10   stated that they would not sign a law enforcement agreement that had a provision that would

11   voluntarily revoke the 2005 and 2011 Agreements.

12      63.    In remarks to a local newspaper, Commissioner Bloyed candidly admitted that

13   the Commission, with Defendant Shirley, the District Attorney, had determined that the

14   alternative to compliance with the agreements was litigation, a reference to the collusive

15   litigation described in the next paragraphs. Bloyed remarked that "Jim's [Shirley's] explanation

16   to us is there are two avenues – one is a new contract that would null and void past

17   agreements.... The other is to bring litigation basically to protect us and basically tie our hands

18   to sticking with the ordinance." A true and correct copy of this newspaper interview is attached

19   hereto as Exhibit Z.

20      64.    On May 15, 2012, the District Attorney signed a Petition for Writ of Certiorari,

21   Mandamus and/or Prohibition in Nevada State Court (the "State Petition") naming only the

22   County Commissioners as defendants, seeking to invalidate the 2005 and 2011 Settlement

23   Agreements based on a claim that the Settlement Agreements violated state law. BRC was not

24   named as a party, and BRC was not served with the State Petition. The County Commissioners

25   declined to contest the requested writ, and a judgment was entered by Judge Richard Wagner

26   (the same judge who, during County Commission meetings, had previously made public

27   statements about the presence of minors at the Event and the invalidity of the Settlement

28   Agreements) purporting to invalidate the 2005 and 2011 Settlement Agreements. True and

1   correct copies of these documents, obtained from the court file and from the District Attorney's

2   Office, are attached hereto as Exhibits AA-CC.

3       65.    The Petition sought an order directing the Commissioners to show cause why the

4   Court should not (1) order the Commissioners to notify BRC that it was required to file an

5   application to hold the Burning Man Event in Pershing County, pursuant to the Nevada Revised

6   Statute that requires each county to enact a Festival Ordinance, and to notify BRC that "the

7   Pershing County Board of Commissioners can no longer perform under any contract that

8   exempts the Burning Man Even from the [County's Festival] Ordinance;" (2) "determine that

9   the [Commissioners] had exceeded their authority in . . . exempting BRC from the

10  requirements" of the state statute requiring enactment of a festival ordinance; and (3) determine

11  that the Commissioners "exercised a manifest abuse of discretion by contracting" with BRC to

12  exempt the Burning Man Event from the Festival Ordinance.

13      66.    The Petition was supported by an attached affidavit from Defendant Shirley

14  ("Affidavit") attesting to certain facts.  The Affidavit indicates that it was personally witnessed

15  on May 15, 2012 by Judge Wagner, who had instigated the proceedings to amend the Festival

16  Ordinance and had testified at the November 16, 2011 hearing of the Pershing County Board of

17  Commissioners in favor of the relief sought.  The endorsed stamp on the Petition indicates that

18  the Petition was not filed until May 16, 2012, which means that Judge Wagner was involved

19  with and had communications about the Petition *before* it was ever filed.  In fact, the Order

20  granting the Petition also was signed by Judge Wagner on May 15, 2012, the day *before* the

21  Petition was filed—they were filed at the same time the following day.

22      67.    The day the Petition was filed and granted, the Commissioners set a special

23  meeting for May 22, 2012 to address the issues raised in the Petition and the Order.

24      68.    At this point, it was only a short period of time until the 2012 Event.  The Event

25  is always held every year during the eight-day period ending on Labor Day, and everyone in the

26  County was well aware of this fact when precipitating these events during the spring of 2012.

27  BRC was operating under severe duress because the BLM Permit expressly required us to have

28  a law enforcement agreement with the County.  If the County refused to enter into a law

- 20 -

1   enforcement agreement, it could derail the entire Event.  BRC had already expended millions of
2   dollars to produce the event in reliance on the 2011 and 2005 Agreements.  I believe the timing
3   of these series of actions by the County was designed to maximize the pressure on BRC.

4       69.    At the May 22, 2012 meeting, the Commissioners voted to implement the
5   provisions in the Petition and signed a stipulation to that effect.  No Commissioner made any
6   statement that the Commission should consider whether to defend the lawsuit that had been
7   filed against them, but simply agreed to the relief requested in the lawsuit without discussion.

8       70.    On May 24, 2012, Judge Wagner issued a Judgment Granting Petition for Writ
9   of Certiorari, Mandamus and/or Prohibition (the "May 24 Judgment") directing that the
10   Commissioners require BRC to apply for an outdoor assembly license for the Burning Man
11   Festival, and to notify BRC that it would no longer comply with the agreements between the
12   County and BRC.

13       71.    Also on May 24, 2012, the County gave notice to BRC that it considered the
14   November 2005 and January 2011 Agreements to be terminated and no longer applicable to the
15   Burning Man Event. The Commissioners notified BRC that BRC was required to apply for an
16   outdoor assembly license under the Festival Ordinance, that the County would no longer
17   exempt the Burning Man Festival from the Festival Ordinance.

18       72.    BRC informed the Commissioners that although it believed the Festival
19   Ordinance could not lawfully be applied to the Burning Man Event, BRC had no choice but to
20   file under duress for a permit under the Festival Ordinance in order to ensure that the Burning
21   Man Event would take place and to avoid damages for which BRC might be liable to
22   participants who had bought tickets or contractors with whom BRC had contracted for services
23   if the Event were canceled.

24       73.    Discussions concerning a law enforcement agreement, which had commenced
25   prior to issuance of the May 15 Order and the May 24 Judgment, terminated.  Since the Festival
26   Ordinance had provisions concerning the payment of law enforcement expenses, the County
27   decided not to have a separate law enforcement agreement but to deal with law enforcement
28   expenses through its licensing under the Festival Ordinance.

74.     The County then imposed conditions on BRC for the payment of law enforcement and other expenses as conditions under the license under the Festival Ordinance. On June 20, 2012, the County issued a license to BRC to hold the 2012 Burning Man Event (the "County Festival License"). A true and correct copy of that Festival License is attached hereto as Exhibit DD.

75.     Among other provisions, Condition 7 of the County Festival License requires BRC to comply with Nev. Rev. Stat. §§ 244.3548(3)-(7) (the Festival Statute), which provide in pertinent part:

> **Unlawful acts.** It is unlawful for any licensee or any employee, agent or associate of a licensee to:
>
> \*   \*   \*
>
> 3. Hold such an assembly in such a manner as to create a public or private nuisance.
>
> 4. Exhibit, show or conduct within the place of such an assembly any obscene, indecent, vulgar or lewd exhibition, show, play, entertainment or exhibit, no matter by what name designated.
>
> 5. Allow any person on the premises of the licensed assembly to cause or create a disturbance in, around or near any place of the assembly, by offensive or disorderly conduct.
>
> 6. Knowingly allow any person to consume, sell or be in possession of intoxicating liquor while in such assembly except where the consumption or possession is expressly authorized by the board and under the laws of the State of Nevada.
>
> 7. Knowingly allow any person at the licensed assembly to use, sell or be in possession of any controlled substance while in, around or near a place of the assembly.

76.     The County Festival License imposed a total fee of $448,000 in addition to a requirement that BRC provide certain services, including provision of a trailer and space to park trailers at a trailer park, provision of fuel to the Sheriff's Office, installation of telecommunications equipment and services for use by the Sheriff's Office, with a value of at least $36,605. The license fee is composed of $398,000 allocated for law enforcement expenses, $25,000 allocated for costs incurred in prosecuting any individuals cited or arrested in

1    connection with the 2012 Burning Man Festival, $5,000 allocated for costs incurred by the
2    County's Recorder/Secretary, and a $20,000 emergency contingency fee. The law enforcement
3    costs imposed under the license fee were almost $280,000 more than the $120,000 in actual
4    costs incurred by the County for the 2011 Burning Man Event, and more than doubled any other
5    year's expenses.

6         77.     I have prepared a spreadsheet and chart demonstrating a comparison of Pershing
7    County Law Enforcement Costs and Arrests from 2006 through 2012. The spreadsheet also
8    includes peak population data for these years. A true and correct copy of the spreadsheet and
9    chart is attached hereto as Exhibit EE. As shown in the chart, the 2012 "costs" were
10   dramatically greater than any prior year.

11        78.     On August 15, 2012 the Commission further amended the festival ordinance to
12   remove the $1.50 per person per day minimum fee. This 2012 Revised Festival Ordinance
13   required that "the license fee will be set and based upon budgets submitted by the various
14   county offices which will incur additional workload and costs from the Assembly." The
15   County Commissioners had complete discretion to examine the proposed budgets and "make
16   any changes that are reasonable and necessary" to cover expenses. The Revised Festival
17   Ordinance further stated that it would not go into effect until September 15, 2012, making it
18   inapplicable to the 2012 Burning Man festival. A true and correct copy of the 2012 further
19   revised festival ordinance is attached hereto as Exhibit FF.

20        79.     On August 16, 2012, BRC filed a lawsuit in the United States District Court for
21   the District of Nevada against the Pershing County Board of Commissioners, among others,
22   alleging violations of the First Amendment to the Constitution and breach of contract, *Black*
23   *Rock City, LLC v. Pershing County Bd of Comms.*, No. 3:12-cv-00435-RCJ-(VPC) (the
24   "Federal Case"). I reviewed the Complaint, and later the First Amended Complaint, before they
25   were filed, and the facts alleged therein are true and correct.

26        80.     After filing suit, BRC also determined that it had no choice but to pursue
27   legislative relief at the state level. The legislative relief was initiated to provide clarification
28   that the BLM Permit governs public health and safety on federal public land and that county

- 23 -

law enforcement at the event is provided pursuant to the BLM Permit. The bill was modeled after Washoe's and Storey County's festival ordinances which are more comprehensive than the other counties' ordinances. Washoe and Storey's ordinances exempt federal land, while the other counties' ordinances did not. I understand that a more complete description of our legislative efforts is described in the Declaration of Adam Belsky, submitted herewith.

81. The Nevada Legislature eventually passed an amendment to its statutes expressly allowing for Counties to exempt events held on federal lands and regulated by the federal government, and to enter into law enforcement services agreements. The legislation expressly permitted such agreements to be of longer duration than the terms of the current set of County Commissioners. After the legislation passed, Pershing County granted such an exemption to Burning Man. The County's exemption legislation and the Exemption Agreement between Pershing County and BRC were drafted by District Attorney Jim Shirley. BRC did not participate in the drafting of either document—except to make a proposal to the revised festival ordinance as mentioned below in Paragraph 84. BRC made comments on the record at open public meetings of the County Commissioners about both documents as noted below.

82. On July 3, 2013 BRC and Pershing County signed the Exemption Agreement at an open public Commissioner Meeting. The Exemption Agreement was in compliance with, and authorized by, the recently passed Nevada State Legislation. The agreement had a term stating that the agreement would automatically terminate if the Burning Man event was not held for two consecutive years on BLM land in Pershing County. BRC asked on the record if the term could be four years instead of two years. However, the County pointed out that the current version of the Pershing County Festival Ordinance only authorized two years. The County said it would consider an amendment to the Festival Ordinance from two years to four years. A true and correct copy of the July 3, 2013 Exemption Agreement is attached hereto as Exhibit GG.

83. On August 21, 2013 Pershing County did a first reading of an amendment to the Pershing County Festival Ordinance to change the consecutive year requirement from "two consecutive years" to "four consecutive years due to an act of God."

84. On October 15, 2013 Mr. Shirley circulated a draft of a proposed change to the

- 24 -

1    Pershing County Festival Ordinance to change the consecutive year requirement from two to

2    four years.  BRC, through its counsel Adam Belsky, responded with suggestions for some

3    minor changes to the language proposed by Mr. Shirley.  A true and correct copy of Mr.

4    Shirley's original draft of the proposed amendment to the Pershing County Festival Ordinance,

5    with BRC's proposed modifications inserted by Mr. Shirley, is attached hereto as Exhibit HH.

6        85.    On October 16, 2013 Pershing County approved in an open public

7    Commissioner Meeting to modify the consecutive year requirement from two to four years.

8        86.    Sometime before December 18, 2013 Jim Shirley drafted the Amended

9    Agreement to Exempt Black Rock City from other Provisions of Pershing County Code 5.16.

10    BRC did not participate in the drafting of this document.  The only change was to amend the

11    consecutive year requirement from two to four years as authorized by the latest version of the

12    Pershing County Festival Ordinance.

13        87.    On December 18, 2013 Pershing County and BRC signed the Amended

14    Agreement to Exempt Black Rock City from other Provisions of Pershing County Code 5.16 at

15    an open and public Commissioner Meeting.  A true and correct copy of the Amended

16    Agreement to Exempt Black Rock City from other Provisions of Pershing County Code 5.16 is

17    attached hereto as Exhibit II.

18        88.    BRC cares deeply about public safety for the Event and has gone to great lengths

19    to ensure that year-after-year, we continue to experience very low levels of crime.  Getting a

20    long-term deal with the County was critical to BRC, because we need to have certainty for

21    planning the Event, and to understand the cost structure of the Event for more than a year at a

22    time.  It also was a huge distraction each year to be threatened by Pershing County, and to be

23    engaged in litigation.

24        89.    I was responsible, on behalf of BRC, for supervising the negotiation of the

25    settlement reached in this litigation.  We began trying to negotiate a settlement in earnest at a

26    mediation in April 2013.  The negotiations involved numerous parties with competing interests,

27    and were at times highly contentious.  District Attorney Jim Shirley, Sheriff Richard Machado,

28    Commissioner Pat Irwin, and attorney Brent Kolvet all attended for the Defendants.  The

1    mediation was not successful.

2         90.    In my personal opinion, what finally prompted Pershing County to come to the

3    table and engage in the settlement discussions that finally settled the case (other than the

4    pressure of the litigation itself) was that BLM representatives told Pershing County

5    representatives that BLM would find a way to proceed with the Event without any prior

6    contract between BRC and the Pershing County Sheriff for law enforcement services.  This

7    happened during separate discussions about the need for BLM Law Enforcement and the

8    Pershing County Sheriff's office to integrate their command for reasons of safety,

9    communication and efficiency.

10        91.    For years prior to 2006, all of the law enforcement agencies operating on federal

11   land were engaged by BLM, so integration was hardly a new concept.  If BLM had lifted the

12   Permit stipulation requiring BRC to have a law enforcement services agreement with the

13   Pershing County Sheriff's Office, as it signaled it was willing to do, this would mean that the

14   County would not have an agreement from BRC where BRC would pay for services and the

15   Sheriff would not have deputies stationed at the Event throughout the duration of the Event, but

16   the County would still have had the obligation under Nevada law to respond to calls from the

17   BLM for public assistance of state and local crimes occurring at the Burning Man Event.  I

18   believe that once Pershing County experienced the significant demands of litigation *and*

19   understood that BRC was not required to enter into a law enforcement agreement that it

20   believed had unreasonably high fees, there was finally the possibility of the parties moving to a

21   settlement agreement.

22        92.    Even so, in the 2013 Settlement Agreement, the amounts that BRC has agreed to

23   pay to Pershing County for law enforcement services in the future is much higher that BRC

24   believed was reasonable and necessary – for example, for the 2013 Event BRC had contended

25   the reasonable value of law enforcement services should have been only $153,000, yet the 2013

26   Settlement Agreement's payment schedule would require a payment of $240,000.  Further,

27   BRC dropped its demand for damages, which was $300,000 for the excess license fees imposed

28   in 2012, $50,000 for the excess license fees imposed in 2013, and several hundred thousand for

1  other compensatory damages. The only reason that BRC was willing to agree in the final 2013

2  Settlement Agreement to might higher payments that it felt was reasonable to recompense the

3  County for the law enforcement services provided was in order to obtain the certainty of a long-

4  term ten year services agreement. Without a long-term agreement, BRC never would have

5  agreed to the significant amounts set forth in the final 2013 Settlement Agreement.

6       93.     There were numerous people involved in various aspects of the negotiations of

7  the comprehensive settlement agreement. I deal regularly with District Attorney Shirley, and he

8  was deeply involved in the discussions and negotiations, as well as outside counsel for the

9  County, Mr. Kolvet. The Sheriff was directly involved. Commissioner Irwin was directly

10  involved. It was always my understanding that Mr. Shirley was reviewing and would have to

11  approve of any agreement before it could be finalized and presented to the full County

12  Commission for approval, and that is exactly what happened.

13       94.     We agreed to a ten-year term concerning the method of calculation and payment

14  for law enforcement services. This is explicitly indicated in the 2013 Settlement Agreement in

15  Paragraph 6.1, where the parties refer to "the ten-year term of the law enforcement services

16  agreed to be provided herein." We never thought that the term of the law enforcement services

17  aspect of the settlement agreement was going to be fifty years, and have never contended that it

18  was fifty years. The Opt Out Agreement is fifty years, but that is a completely separate

19  instrument. When the Court raised the issue at the November hearing about the length of the

20  law enforcement services agreement, I readily instructed BRC's counsel to confirm on the

21  record that our settlement agreement was a law enforcement deal for ten years.

22       95.     At no time throughout the settlement process was there any collusion. The

23  settlement involved a give and take in which both sides compromised their interests. We did

24  not get everything we demanded, nor did the County. There were multiple drafts of

25  agreements, language was proposed by both sides, and changes were made by both sides.

26       96.     The integrated command idea being part of a settlement agreement came from

27  the County after the mediation in April 2013 (at which the Sheriff was present), and after the

28  county had already had a meeting where BLM proposed the idea of integration, and it was fully

1   consistent with what had already happened for many years up through 2005, before BLM

2   moved to its cost-recovery scheme.

3       97.    The paragraph in the 2013 Settlement Agreement providing that Pershing

4   County will not try to separately regulate the presence of children and minors at the Event

5   where that is already regulated by the BLM Permit was simply a contractual confirmation of the

6   Exemption that had already been granted by the County pursuant to the Nevada Revised

7   Statutes—it was an agreement that, since the BLM under the permit issued by the BLM was

8   already regulating issues relating to the presence and safety of children and minors at the Event,

9   the County would not impose conflicting regulations on this topic – in the same manner that,

10  since the BLM regulates sanitation, traffic and water at the Event, the County does not

11  separately impose conflicting regulations. The BLM Permit explicitly states that BRC is to

12  comply with state and local laws, and that the Pershing County Sheriff's Office is to enforce

13  state and local laws. Thus, this provision is not in any way an impediment to the Sheriff's

14  enforcement of existing state criminal or child welfare laws, and the 2013 Settlement

15  Agreement makes clear that the Sheriff has final say on the enforcement of state and local laws.

16  Viewpoint-based regulation was the core of what was at issue in the lawsuit, and in our view

17  the final contractual provision is fully consistent with the ultimate injunction that we would

18  have sought in the litigation, both on preemption and first amendment grounds.

19      98.    The 2013 Settlement Agreement was made public at a meeting and was duly

20  approved by the County after that public meeting, as required by Nevada law. At no time did

21  we ever seek to, nor did we, collude or mislead the Court or anyone else about the settlement or

22  any of the terms of the settlement. A true and correct copy of the fully executed

23  Comprehensive Festival Ordinance Waiver, Law Enforcement and Settlement Agreement

24  between Black Rock City LLC and Pershing County, Nevada, with exhibits, is attached hereto

25  as Exhibit JJ.

26  \ \ \

27  \ \ \

28  \ \ \

- 28 -

1          I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct. Executed this 3rd day of February, 2014 at San Francisco, California.

3

4                      RAYMOND ALLEN

5

6  OHSUSA:756197997.14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28